[No. A017290. First Dist., Div. Two. Dec. 12, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT HOWARD SINGER, Defendant and Appellant.

[No. A048322. First Dist., Div. Two. Dec. 12, 1990.]

In re ROBERT HOWARD SINGER on Habeas Corpus.

**COUNSEL**

Richard B. Mazer and David A. Nickerson, under appointments by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Thomas A. Brady and Donna B. Chew, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SMITH, Acting P. J.**—A jury found defendant Robert Howard Singer guilty of first degree murder and conspiracy to commit murder (Pen. Code, §§ 187, 182; all further section references are to that code unless noted otherwise), returning special circumstance findings that he aided or otherwise assisted an intentional murder carried out for financial gain (§ 190.2, subds. (a)(1), (b)). The jury set the penalty at life without the possibility of parole. Defendant appeals from the judgment.

The convictions are for the March 1980 contract murder of his wife's former husband, Howard Witkin. Cohorts Andrew Lee Granger, Gary Mike Oliver and Thomas Michael Maciolek were also charged in the same information, but the superior court ordered severance for Oliver and Maciolek. A first trial, of defendant and Granger in 1981, ended in conviction for Granger and a deadlock and mistrial as to defendant.

Retrial for defendant began in January and ended in March 1982. While the instant appeal was pending, we affirmed the conviction and life-without-parole sentence for Granger, in the first trial, by an unpublished opinion filed in January 1984 (*People* v. *Granger* (Jan. 1984) No. A011166). We have ordered the record in Granger's case made a part of the record here.

Resolution of this appeal was delayed pending the determination of an original petition for habeas corpus filed in this court (No. A032261) in August 1985. Finding potential merit to claims that trial counsel had a conflict of interest, we issued an order to show cause returnable in the superior court. That court took evidence in a hearing extending from July to November 1986. Finding conflicts of interest but no prejudice, the court discharged the alternative writ and denied relief by an opinion filed in April 1987.

In January 1990, on the day before oral argument on the appeal, defendant filed a second original habeas petition (No. A048322) in this court, raising the same issues as before and relying on the record created in the first. We issued an order to show cause and have ordered the appeal and habeas corpus petition considered together for purposes of decision. For

reasons set out herein, we will grant the writ, vacate the judgment and address those appeal issues which are likely to arise again on retrial.

## BACKGROUND

We separately summarize the records from the retrial and habeas proceedings. We consider evidence from the first trial, where necessary, in the discussion which follows.

### Retrial record

Witkin was shot to death on the evening of March 21, 1980, at his home in San Jose. Evidence from the crime scene showed that he was struck nine times in a hail of gunfire from a .22-caliber Marlin brand rifle at his front door. Bullet holes through the door suggested that he was first shot outside and then retreated behind the door, where he was hit by more rounds. An alert neighbor had earlier noticed two people in a faded gold, 1970's model car with an out-of-state license plate (VNM 530) in the neighborhood.

Witkin, an executive at a Santa Clara glass and mirror factory, had been married to Judith Singer (defendant's wife at the time of the killing), but the union, which produced three children, ended in divorce. At the time of the killing, Judith was married to defendant and had moved with him and the children to Flint, Michigan, where defendant that past December opened a soup-and-sandwich place called the Onion Crock Restaurant, in the Genessee Valley Mall.

Richard Powell, a security guard at the mall who had gotten to know defendant, testified that in late January or early February (all dates are in 1980 unless noted otherwise), defendant asked him if he knew someone who did "contracts," explaining that his ex-wife was "soaking" him for money and that he would like to kill her. He seemed serious, asking again a couple weeks later, and apparently wanted the contract executed in California. Powell said he was not looking for anyone.

Kevin McCarthy, general manager at the Onion Crock, helped defendant open the restaurant and did all of the hiring and firing. He testified that in late February to early March defendant asked him where he could find a "hit man," someone who could "waste another person." McCarthy did not know what to say but did not turn him down. A couple days later, defendant had McCarthy accompany him to a local night club, the Aladden, where McCarthy knew the manager. Defendant told McCarthy to ask the manager where they could get a hit man. McCarthy obliged. Upon returning with apparently disappointing news, defendant said, "Let's go," and

they left. Then, a day or two later, defendant began pressuring him to help get a hit man. He mentioned money—as much as $10,000 to $25,000. McCarthy told him he would "take a wild chance and make a phone call." He tried to call a friend in Detroit (who was not a hit man) but could not reach him. McCarthy was concerned for his job and so was trying to "humor" defendant, who appeared serious. He told him on a later occasion that he had gone back to the Aladden "to check again," but in fact he had not gone for that reason.

One of the people hired by McCarthy was Gary Oliver, who started as a busboy and quickly worked his way up to cook. Defendant kept telling McCarthy "from day to day that he had to get that problem solved" and seemed obsessed with the idea. Eventually, though, he quit bringing it up. Then, on returning to work after taking St. Patrick's Day (the 17th) off, McCarthy was surprised to learn from defendant that he had personally fired Oliver. (This was odd because McCarthy did all the hiring and firing.) That same month, sometime before defendant and his wife were to leave on a planned trip to California, McCarthy overheard defendant talking on the phone to someone about buying a low-priced car. Defendant and his wife left for California on learning that Witkin had died. While they were gone, McCarthy saw Oliver at the restaurant. Oliver was tanned, had money and nice clothes, and said he had been to California, where his car had blown up and had to be deserted. Defendant telephoned from California and, in the course of a conversation, said "that his problem had been taken care of." McCarthy went to Michigan state police with his suspicions on April 1st.

Oliver, who had not testified at the first trial, testified at the second. Midway through the People's case, he entered a plea to solicitation of murder (§ 653f), with a maximum sentence of six years expected, and agreed to testify. He recounted that defendant asked him in March if he would be interested in making $10,000 for killing someone for him. He kept "pestering" Oliver, who refused at first, and eventually gave him a slip of paper with Howard Witkin's name and address on it.

Oliver in turn solicited Andrew Granger, saying he was getting $5,000 and would give him half. Furnished with money by defendant, they bought a shotgun for $300 and a 1970 or 1971 gold Chevrolet Malibu (license plate VNM 530) for $450. They registered the car in the name of Dennis Liquia, a friend who accompanied them there, and promised to give him the car when they were through with it. (Liquia testified to the sale and arrangement, and a Michigan sales clerk testified to Granger's purchase of a 12-gauge shotgun.) The car ultimately had to be abandoned in San Jose, but Granger and Oliver brought back the license plates and gave them to Liquia.

Oliver and Granger drove to California with the newly bought shotgun and a .22-caliber gun which Granger had. They reached San Jose on Thursday, March 20 and drove around Witkin's home to stake it out that night. The car broke down the next day, and Oliver had Granger place a long-distance call to ask defendant for more money. Defendant spoke with Oliver and told him they would get no money until the job was done. While stranded there, they met Tom Maciolek and Maciolek's girlfriend Heather. They stayed with them that night (Friday the 21st), explaining their plans.

Maciolek gave them a ride to Witkin's house that night. They dropped Granger off near the house and parked. Granger returned saying he thought he had done it. He related ringing the doorbell, shooting Witkin when he emerged and then, when Witkin went back in and slammed the door shut, shooting through the door, trying the door and finding it locked.

The next morning, Oliver and Granger called defendant from a phone booth. Defendant asked Oliver if he did it, and Oliver said he thought so. Granger asked for money to get home, and defendant sent a Western Union Moneygram the next day. They left the shotgun with Maciolek and returned to Michigan by bus. After they got back, defendant called Oliver from California to congratulate him and said he would "take care of" (meaning pay) him when he got back. Defendant thereafter sent Oliver $500 a week, part of which Oliver gave to Granger. (Western Union employees and records verified that a "Stewart Granger" in Flint, Michigan wired $600 to Andrew Granger in San Jose on March 22. Public records did not show a Stewart Granger living at the address given by the sender.)

Granger did not testify live. When called to the stand, he invoked his privilege against self-incrimination, apparently because his appeal was pending in this court, and was ruled unavailable. His testimony from the first trial was read into evidence.

Granger's account closely tracked Oliver's except that Granger was kept in the dark about the target of the enterprise until he and Oliver reached California. Until then, Oliver had said that they were after a dope dealer who sold to kids. Once across the California border, Oliver showed Granger pictures of Witkin and a piece of paper with Witkin's name and address on it. Also, Granger had no direct contact with defendant until he spoke with him on the phone just before the murder, after the car broke down in San Jose. Granger came to know that the one hiring them (referred to as "Bob" or "Mr. Big") was Oliver's boss in Michigan and that the victim was the boss's wife's ex-husband. "Bob" told him on the phone, after the murder, that he would send the money in Granger's name so that there would be no record of his employee Oliver being in San Jose. Granger used a .22-caliber

Marlin-Glenfield rifle which he brought along as a backup to the shotgun they bought.

Other corroborating witnesses included Shirley Hall, Oliver's girlfriend in Michigan, who recounted his absence from the state, ostensibly for a trip to Utah. Prior testimony from unavailable witness Heather Smith, Maciolek's girlfriend in San Jose, corroborated Oliver and Granger's stay with them on the night of the killing. A search of Granger's room in Michigan, where California detectives were working side by side with Michigan state police, produced bus schedules and other evidence of the trip to California, a phone bill made out to Tom Maciolek, a San Jose street map with Witkin's house location circled, a Marlin-Glenfield rifle owner's manual and the box and sales slip for the shotgun. The shotgun was recovered in a search of Maciolek's apartment, but the murder weapon was never recovered.

Evidence tending to show that defendant thought that he, his wife and the children, fathered by Witkin, stood to profit by Witkin's death (through insurance, trusts, etc.) was discounted by jurors, who found that he did not expect to receive financial gain from the murder.

The defense proposed a dramatically different theory of the killing, a reverse murder-for-hire in which hirer became victim when the deal went sour. Mitchell Henderson, who had occupied a cell adjoining Oliver's in county jail after Oliver's arrest, and when defendant was also in the same jail, recalled Oliver confiding this account to him: A man from California (read Witkin) approached him at the mall in Michigan, asked him if he knew a man named Bob (defendant) and his wife (Judith), and showed him a snapshot of Bob's wife. When Oliver replied that he knew them, the man said he wanted Oliver to "take out" (meaning kill) Bob's wife. But Oliver said he "didn't dig . . . doing that to no woman," and so the man asked about Bob, saying, "If you take Bob, I can get my kids, and I get some insurance money and if I be lucky . . . I even get my wife back." The man paid Oliver some amount right then and left but later backed out of the deal and refused to pay the rest of the money. Oliver told him over the phone that he was coming to get his money, but the man said he would not pay. Oliver and a friend, Granger, drove to California and confronted him at his home. Granger shot him, and the two fled back to Michigan. Though Bob had nothing to do with the killing, Oliver was scared and, deciding to let Bob "take the weight," implicated him. Henderson testified that he mentioned this to defendant at the jail but did not tell the authorities.

Apparently to bolster that theory, the defense introduced testimony from friends of Witkin that Witkin was extremely cautious and always asked who was at the door before opening it.

In rebuttal, the People played a taped interview by Oliver given after his arrest, as a prior consistent statement. Also, Oliver had already testified that he had read newspaper accounts of Henderson's story, but the story was false and he never told it. He told Henderson that defendant hired him and Granger to shoot the victim. Oliver testified that defendant approached him several times in jail with an offer of money and a job if he would adopt Henderson's story. Oliver noted that Henderson and defendant remained jailed together after he left.

On the conspiracy count, jurors found true alleged overt acts that, in furtherance of the conspiracy, Oliver and Granger came to Santa Clara County and Maciolek drove to the area of Witkin's house. Jurors found it untrue that defendant sent money to Santa Clara County to further the conspiracy.

### Habeas corpus record

Procedurally, the habeas corpus petition comes to us in much the same manner as did the habeas corpus petition in *In re Hochberg* (1970) 2 Cal.3d 870 [87 Cal.Rptr. 681, 471 P.2d 1]. There, as here, a first original petition filed in the appellate court led that court to issue an order to show cause returnable in the superior court. The superior court then took evidence and, by a written order, denied relief. Because the order was not appealable, the defendant filed a second original petition in the appellate court, on the same grounds but relying on the record created in the first proceedings, and the higher court again issued an order to show cause, this time returnable before itself. (*Id.*, at pp. 873-876; cf. *In re Smiley* (1967) 66 Cal.2d 606, 611 [58 Cal.Rptr. 579, 427 P.2d 179].)

■ This being a second original writ proceeding, we are not directly reviewing the lower court's decision. The superior court made all factual and legal determinations, denying relief and thus leaving nothing for direct appellate review. (*In re Hochberg, supra*, 2 Cal.3d 870, 874-876.) Nevertheless, because the same record is brought up in these second proceedings, we view it as we would had the superior court judge been appointed referee here. That is, we independently review the record of the criminal trial and habeas corpus proceedings (*id.*, at pp. 876-877), deferring to the hearing judge's resolution of disputed factual issues since he had the opportunity to observe the witnesses' demeanor on the stand and to weigh their testimony accordingly (*In re Atchley* (1957) 48 Cal.2d 408, 411 [310 P.2d 15], cert. den., 355 U.S. 899 [2 L.Ed.2d 195, 78 S.Ct. 273]). Pure findings of fact are upheld if supported by substantial evidence. We do not defer to legal conclusions or conclusions on mixed questions of law and fact. (*In re Cordero* (1988) 46 Cal.3d 161, 180-181 [249 Cal.Rptr. 342, 756 P.2d 1370].)

Defendant's petition alleged that counsel William C. Melcher, who defended him in both trials, maintained a covert sexual relationship with his wife, Judith Singer. This posed a purely factual question. The hearing judge found it to be true, making certain findings as to the relationship's scope as well, and both sides appear to concede that the evidence supports the findings. We therefore accept them.

The judge accepted Judith Singer's "recollection of a sporadic and intermittent relationship" and dismissed, as lies, Melcher's denial and claim of impotence.

Judith Singer testified that the affair began toward the end of the first trial, broke off when Melcher returned to his Los Angeles practice during a hiatus between trials, resumed sometime during the People's guilt-phase case at retrial, and ended before closing arguments in that phase of trial. Sexual relations were initiated mutually and occurred "[n]ot very" many times, always at Melcher's motel room or (during the retrial) apartment. Melcher flew home on weekends. It was an on-and-off affair. They had a "tacit understanding" that it would end once the case was over, with Melcher returning to his Los Angeles practice and Judith returning to Michigan.

Judith so testified despite contrary implications in a "press statement" released by Melcher in March 1982, just before sentencing.[1] Judith had worked closely with Melcher in most aspects of the case, even performing some "paralegal" research work. The press statement acknowledged her help, adding: "Mrs. Singer announces her intention to enter law school with the further intent to enter practice with myself and my associates upon completion . . . ." Judith testified, however, that she did not see the statement until it was released: she had discussed the possibility of law school but had never decided to go or to join Melcher in practice. She said, "It was always my intention to go home."[2]

---

[1] That statement and various newspaper accounts in the record on appeal show that Melcher played the case to the press during both trials. During the first trial, for example, he and Judith reported to police that they had been standing at a phone booth in San Jose one night when gunfire from a passing car blew out the glass, narrowly missing them. Asked at the hearing about the event, Judith invoked her self-incrimination privilege but, when granted immunity, revealed that the event had been staged, at Melcher's urging, for publicity.

[2] The press statement went on: "Mrs. Singer and I have also been contacted by a major New York publisher and negotiations are currently underway concerning co-authoring a book on the trial and the intensely intriguing undertones of the Singer Case. Screen rights to the subject are also being sought by a major studio. It is projected that the final manuscript will be completed by January of 1983." Testimony showed this to be hype, however, as Judith had simply received one inquiry letter from a publisher, the idea never going further. This supposed literary-rights deal was pleaded as a possible conflict in the first habeas

Documenting the affair are a series of notes and cards which Judith testified she sent to Melcher at his office in Los Angeles, apparently during the hiatus between trials. Dubbed the "love letters" in the hearings below, they reveal a romantic and emotional dependence by Judith and connote sexual intimacy. They came to light through Linda Bennet, a legal secretary at Melcher's office who left his employ sometime during the second trial. She testified that she found them in a file drawer, made copies and took the copies home, also showing them to others in the office and to attorney Vincent Bugliosi, a friend with whom Melcher later came to have a falling out related to the case. A bitter dispute erupted between Bennet and Melcher over the prior employment, and Bennet went to the State Bar with the letters in October 1983. Getting no response there, she embarked on an anonymous, obscenity-laced hate-mail campaign against Melcher in early 1984, threatening (as "The Voices of Truth") to expose the relationship. She ultimately notified defendant. The habeas corpus proceedings in this case followed Bennet's revelations. The hearing judge accepted the love letters as genuine.

Defendant testified that he did not know about the relationship, apart from early rumors which he discounted, until he received one of the anonymous letters. The hearing judge, finding insufficient evidence of a conflict *waiver* and thus no need to decide just what defendant "actually knew," nevertheless was "not inclined to accept [his] testimony, denying knowledge, as true . . . ." Defendant testified that he encouraged Judith to work closely with Melcher on the case, suggested that Melcher stay with her and the children at their San Jose townhouse between trials, and knew through phone calls he made from the jail that she could often be found at Melcher's residence.

One of the children, Marie (aged 14 to 15 during the trials), testified to a steadier involvement than Judith had, recalling that her mother returned home to the townhouse only on weekends after driving Melcher to the airport. The judge, however, found this to be "the product of an exuberant youth, eager to exaggerate her plight, rather than an accurate recitation of historical events . . . ." That finding is supported. Marie was certain, for example, that the second trial began not in January 1982, but in September 1981, when school started, and that she slept only three to four hours a night. Marie saw her mother purchase many of the cards sent to Melcher but evidently did not learn of the affair until her mother, fearing that Marie would learn of it first through the press, told her in 1984.

Attorney Martin Staven, a longtime acquaintance and friend of Melcher's, did some research work on the Singer case for him during both trials

---

petition, but the hearing judge found no such deal—only an apparent "attempt to impress or curry favor with the media." Defendant accepts that view; he has not repleaded the issue.

(and later wound up in a fee-billing dispute over it which soured the friendship). He testified that Melcher revealed the affair to him in Los Angeles, between the trials. Melcher said that Judith had been trying to seduce him and that the affair began when he eventually "succumbed to her advances."

Staven said Melcher described the relationship as "continual"—"Basically that she would pick him up at the airport, they would go to an apartment; that she would not leave him; that she would bother him, want attention, want to make love; that she was, in fact, wearing him down; that she interfered with his work on the case; that he could hardly wait to get the whole trial over with because he was going crazy. And that he didn't think he could handle it much longer." He said she stayed every night at the apartment with him and would not leave. "He said he had to work on weekends or try to catch up, because he couldn't get enough done during the week." It was "his continuing complaint."[3] The hearing judge, who rejected the daughter's account of a constant affair and adopted instead Judith's account of a "sporadic and intermittent" one, must have likewise discounted Staven's testimony on this point. That view is supported by the evidence as a whole. The judge could easily have inferred from Staven's testimony (Melcher had told him details of past affairs and showed him sexually suggestive slides taken of the women) that Melcher exaggerated the affair.

The judge did rely on Staven's testimony as showing that the sexual relationship existed and to discredit a claim by Melcher that an April 1978 vasectomy left him impotent and uninterested in sex.[4] The admitted relationships with Judith and with other women in 1978 and 1979 impeached Melcher's claim. So did medical testimony that he was treated for recurrent fissures on his penis and a sexually transmitted virus, both conditions arising after the vasectomy. Melcher's wife testified that he had been unable to

---

[3] Having previously secured favorable rulings excluding all evidence of what *effect* the relationship might have had on the conduct of the defense at trial, counsel for defendant stressed, in the face of objection, that this evidence was admitted solely to show the fact and breadth of the relationship, not to suggest that it might have affected Melcher's performance at the trial.

[4] Melcher admitted a close relationship with Judith throughout the case, corroborating Judith's and defendant's testimony that her involvement was, from the very first phases of the case in Michigan, at defendant's insistence.

Melcher denied any sexual affair, however, and felt he had been "set up" by them. At the preliminary hearing in January 1981, Judith had asked him what legal or ethical problems there were in a lawyer having an affair with a client's wife. Then she insisted on spending all her time with him, to the point where he was concerned how this appeared to others. During the first trial, Judith told him that "the final chapter of the book hadn't been written yet" and that it "[w]ouldn't be written for a number of years . . . ." She refused to explain what she meant. After his conviction in the second trial, defendant told Melcher that he and Judith had a "pact." She was "working on something," and they had a "fail-safe" plan. Then, in a holding cell on the day of sentencing, defendant said, "[I]t's not over yet."

have sexual intercourse with her since the vasectomy. The judge, while finding her to be truthful, speculated that she might be "the victim of a deceitful and philandering spouse . . . ." The judge also dismissed, as sincere but "assum[ing] too much," testimony from a friend and confidant who sensed from Melcher's apprehensions before the vasectomy and from talks afterward that he was left impotent.

Thus the record supports the judge's conclusion that Melcher and Judith Singer had a sexual-romantic relationship toward the close of the first trial and through the guilt phase of the second, more or less as related by Judith Singer. The judge found Melcher's "credibility as a witness . . . so undermined that his protestations of sexual innocence [were] insufficient to refute" other evidence on point.

The judge also found a second conflict of interest, though one arising solely from an invocation of attorney-client privilege by Melcher. The judge curtailed all inquiry into the relationship once it was raised, and the revelation caught both sides in the proceedings off guard.[5]

Defendant's counsel was cross-examining Melcher about the truth of the press release, and Melcher said he had relied on information from Judith in preparing it and had "trusted her integrity" in the matter. When asked how he could have trusted the integrity of a woman he felt might have been a "moving force in the murder of Howard Witkin," Melcher answered, "Whether or not I had formed that impression, sir, I am not able to reveal to you, based upon the attorney-client privilege at that time." Asked if he was representing her "on the 187 homicide case," Melcher again invoked the privilege. After some discussion with the judge, counsel then asked: "Prior to the time that you issued this press statement, Mr. Melcher, did you have an attorney-client relationship with Judith Singer concerning any aspect of the murder of Howard Witkin?" Melcher replied, "I most surely did." He then repeated that he would invoke the privilege again, "[a]s to the question you asked me . . . ."

---

[5] The statement of decision states: "A more perplexing problem was disclosed during the testimony of Mr. Melcher. For the first time, apparently, it was learned that he had advised Mrs. Singer regarding her personal liability in the underlying homicide. Further inquiry into this area was curtailed by the claim of attorney-client privilege. Although the parties disagree with the Court, in the setting of this case the Court feels the claim of privilege, when made by an attorney, rather than a non-lawyer witness, must be accepted as made in good faith. An attorney is an officer of the court and is duty bound to not mislead the court . . . . The claim of privilege by an attorney inferentially establishes the existence of the attorney-client relationship. As Melcher invoked the privilege, the Court must accept that Melcher had formed an attorney-client relationship with Mrs. Singer concerning the murder of Howard Witkin. This relationship was separate and distinct from any similar relationship with the Petitioner regarding this same case and created, at the least, a potential conflict of interest."

The hearing judge found, "at the least, a potential conflict of interest" in what thus appeared to be a problem of Melcher simultaneously representing both defendant and Judith Singer. (See fn. 5, *ante*.) Not surprisingly, given the vagueness of the record, no finding was made as to *when* that dual representation occurred. Only Melcher's invocation of privilege supported the relationship's existence.[6]

The hearing judge found the two conflicts but, citing a lack of evidence showing how the conflicts adversely affected the representation at trial, denied the writ. The parties each attack the decision in various respects. However, because we do not directly review the hearing judge's decision in these second proceedings and because that court's determinations of legal and mixed legal/factual questions would not be entitled to deference in any event (*In re Cordero, supra*, 46 Cal.3d 161, 180-181; *In re Hochberg, supra*, 2 Cal.3d 870, 876-877), there is no need to set out the hearing judge's reasons in detail.

## HABEAS CORPUS

■ Under both the Sixth Amendment to the United States Constitution as applied to the states through the due process clause of the Fourteenth Amendment and article I, section 15 of the California Constitution, a defendant in a criminal case has a right to the assistance of counsel. This entitles a defendant not to some bare assistance but rather to *effective* assistance. Included in the right to effective assistance is a correlative right to representation that is free from conflicts of interest. ■ The constitutional guaranty protects the defendant who retains his own counsel to the same degree and in the same manner as it protects the defendant for whom counsel is appointed, and recognizes no distinction between the two. ■ Finally, this right is fundamental, being among those constitutional rights which are so basic to a fair trial that their infraction can never be treated as harmless error. (*People* v. *Bonin* (1989) 47 Cal.3d 808, 833-835 [254 Cal.Rptr. 298, 765 P.2d 460], cert. den. (1990) __ U.S. __ [108 L.Ed.2d 641, 110 S.Ct. 1506].)

### I

■ The evidence adduced at the initial habeas corpus hearing clearly indicated, and the hearing judge found, that a romantic relationship existed

---

[6] Early in the hearing, in fact, Judith had testified that she was *not* Melcher's client for "the case in which Robert Singer was tried for murder . . . ." She did not retake the stand after Melcher invoked the privilege.

Defendant, who heard Melcher's testimony, did take the stand afterward. However, he said that he did not know of any attorney-client relationship between Judith and Melcher as to the murder. He did know of such relationships for civil and child-visitation matters and for a December 1982 incident in which Judith was arrested for shoplifting from a Sears store.

between defendant's trial attorney Melcher and defendant's wife which resulted in a conflict of interest. Further, the hearing judge found an inference of a second conflict of interest because the attorney had formed an attorney-client relationship with defendant's wife concerning the murder of Howard Witkin. Defendant denied knowledge of either of these conflicts of interest. There was no finding below that he had waived either of the conflicts of interest.

Defendant's wife indicated that the affair commenced near the end of the first trial and continued on an intermittent basis until the guilt-phase of the retrial. This evidence was believed by the hearing judge below. Therefore, during crucial periods of both murder trials, defendant's attorney was involved in an affair which introduced deception and duplicity into the advocate-client relationship, which by definition must be grounded in trust and fidelity. This faulty dynamic was made worse by Melcher's counsel of Mrs. Singer concerning her own potential liability regarding the Witkin murder. Could Melcher bring undivided loyalty and effort to defendant's cause when (1) he intercepted love and affection from defendant's wife, and (2) he counseled Mrs. Singer in matters where her interests were potentially adverse to those of defendant? Was not defendant prejudiced by these conflicts of interest?

Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a defendant in a criminal case has a right to the assistance of counsel. This right means effective counsel free of conflicts of interest that deprive a client of undivided loyalty and effort. (*Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 612 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333].) "[T]he constitutional guaranty protects the defendant who retains his own counsel to the same degree and in the same manner as it protects the defendant for whom counsel is appointed, and recognizes no distinction between the two. [Citation.]" (*People* v. *Bonin, supra*, 47 Cal.3d 808, 834.)

Settled precedent holds that dual representation such as found in this case creates a setting for conflict. "Conflicts may . . . arise in situations in which an attorney represents a defendant in a criminal matter and currently has or formerly had an attorney-client relationship with a person who is a witness in that matter. [Citations.]" (*People* v. *Bonin, supra*, 47 Cal.App.3d 808, 835; see *Leversen* v. *Superior Court* (1983) 34 Cal.3d 530, 536-540 [194 Cal.Rptr. 448, 668 P.2d 755].) Judith Singer was a defense witness at the first trial; she was a potential witness in the second.

There appears to be no direct precedent holding that an affair with a client's spouse raises a conflict of interest. However, such a conclusion is

inescapable. The closest California precedent involves a "dating" relationship between a prosecutor and defense counsel in the same trial. The court in *People* v. *Jackson* (1985) 167 Cal.App.3d 829, 832-833 [213 Cal.Rptr. 521] (*Jackson*), observed: "[T]hose who are involved in a sustained dating relationship over a period of months are normally perceived, if not in fact, as sharing a strong emotional or romantic bond. [Citation.] Such an apparently close relationship between counsel directly opposing each other in a criminal prosecution naturally and *reasonably gives rise to speculation* that the professional judgment of counsel as well as the zealous representation to which an accused is entitled has been compromised. [Citation.] No matter how well-intentioned defense counsel is in carrying out his responsibilities to the accused, he may be subject to subtle influences manifested, for example, in a reluctance to engage in abrasive confrontation with opposing counsel during settlement negotiations and trial advocacy. [Citation.]" (Italics added.)

The parties debate whether the conflicts in this case are actual or potential, but it makes no difference. Federal constitutional law requires a defendant who has not objected to a conflict at trial to show an *actual* conflict which adversely affected his lawyer's performance. (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 104 [197 Cal.Rptr. 52, 672 P.2d 835], discussing *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 348 [64 L.Ed.2d 333, 346-347, 100 S.Ct. 1708]; *Burger* v. *Kemp* (1987) 483 U.S. 776, 783 [97 L.Ed.2d 638, 650, 107 S.Ct. 3114].) Cases under the California Constitution, by contrast, hold "that even a potential conflict may require reversal if the record supports 'an informed speculation' that appellant's right to effective representation was prejudicially affected. Proof of an 'actual conflict' is not required. The same principles apply when counsel represents clients whose interests may be adverse even when they are not codefendants in the same trial." (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 105, citations omitted.) In the instant case, the distinction between actual or potential conflicts is not critical because defendant has raised his claims under both federal and state law. Even a potential conflict that is prejudicial is enough to compel reversal.

## II

Here, based on the hearing judge's findings, there were two at least potential conflicts of interest. Applying the informed-speculation standard to those conflicts as shown on this record, prejudice clearly appears.

Just as with the sexual-romantic relationship in *Jackson* between defense counsel and the prosecutor, the relationship here between defense counsel and defendant's wife deprived defendant of his constitutional right to the

"undivided loyalty and effort" of his attorney. (*Maxwell* v. *Superior Court*, *supra*, 30 Cal.3d 606, 612, citation omitted.) The validity of our adversarial system depends upon the guaranty of this "undivided loyalty and effort" for every criminal defendant. Given the instant facts, a defense attorney, in the extreme, might be influenced to see his client convicted and imprisoned so that the affair can continue or remain undiscovered. More subtle influences could arise where the wife is a potential witness in the case, as was true here. Reluctance to call or engage in abrasive confrontation with a witness could jeopardize a case as easily as reluctance to vigorously oppose counsel on the other side. The attorney could be tempted to avoid calling a witness who might impugn his lover's integrity or implicate him or her in the case. Also, it is logical to speculate, from the facts present here, that a defense attorney might forego trial strategies that would impose a costly burden on his lover. In other words, defense counsel might "pull his punches." Any of these considerations could jeopardize the duty of undivided loyalty owed the client. At the very minimum these informed speculations, based upon the record, indicate the existence of a potential, prejudicial conflict.

Defendant's confidence in his attorney was vital to his defense. "His right to decide for himself who best can conduct the case must be respected wherever feasible." (*Maxwell* v. *Superior Court*, *supra*, 30 Cal.3d 606, 615, fn. omitted.) In the instant case, as in *Jackson*, a "potential if not an actual conflict has been demonstrated and thus the appearance, at least, of impropriety. In these circumstances, we are foreclosed from ' " 'indulg[ing] in nice calculations as to the amount of [resulting] prejudice.' " ' " (*Jackson*, *supra*, 167 Cal.App.3d 829, 833, quoting *Maxwell* v. *Superior Court*, *supra*, at p. 612.)

Here, unlike *Jackson*, the conflict is all on the defense side. The state is not involved at all. However, erosion of public confidence in the criminal justice system is one of the main rationales of the *Jackson* case (*Jackson*, *supra*, 167 Cal.App.3d 829, 832-833; see also *People* v. *Rhodes* (1974) 12 Cal.3d 180, 180-186 [115 Cal.Rptr. 235, 524 P.2d 363]); and such public confidence suffers equally when conflicts of the kind present here exist. Given an undisclosed affair between the defendant's wife and his attorney, the professional attorney-client relationship becomes tainted and interwoven with a romantic relationship. Strategic case decisions may have been made by defense counsel to favor the interests of the wife over those of defendant, or to conceal the existence of the affair at defendant's expense. Either way a defendant is prejudiced by failing to have counsel unencumbered by potential divided loyalties. "It is important [not only that] there is in fact fairness in the judicial system but that the appearance of fairness to the accused be maintained in order to sustain public confidence in the system. [Citations.]" (*People* v. *Hinkley* (1987) 193 Cal.App.3d 383, 391

[238 Cal.Rptr. 272].) " 'The preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount . . . . [These considerations] run to the very integrity of our judicial process.' [Citation.]" *(Comden* v. *Superior Court* (1978) 20 Cal.3d 906, 915 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562], fn. omitted, cert. den., 439 U.S. 981 [58 L.Ed.2d 652, 99 S.Ct. 568].) The public's confidence in the criminal justice system is surely eroded by the appearance of impropriety present in this case.

■    Prejudice must also be assessed in conjunction with the dual representation conflict. This conflict, like the romantic affair, raised many of the same risks of prejudice and similarly undermined public confidence.[7] The dual-representation conflict, on this record, was so interwoven with the sexual-romantic affair that differentiating the exact amount of the effect of one conflict from the other is impossible. *(Jackson, supra,* 167 Cal.App.3d 829, 833.)

Compounding the appearance of prejudice in this unusual case is evidence that Melcher also represented Judith Singer in a visitation dispute, evidently over the period of both trials. Judith had custody of three minor children from her former marriage to Witkin, and the children's paternal grandparents (Witkin's parents) sought visitation rights. Ultimately, after mediation, the court disallowed visitation.

Melcher also filed a libel suit on behalf of Judith, defendant and the children against the San Jose Mercury News and a reporter over a published report of something the prosecutor said at the first trial. Melcher further represented Judith, from just after the first trial through the second, on a matter concerning Witkin's estate.[8]

These other legal representations were disclosed to defendant, acquiesced in by him, were not alleged as conflicts here and thus do not directly concern us. However, these are circumstances suggesting prejudice flowing from the *un*disclosed conflicts. For example, an attorney inclined to protect a client's wife in order to protect a covert relationship will have even more reason to shelter her at the client's expense when he is concurrently representing her interests elsewhere. It is not hard to see that Judith Singer's testimony could have harmed her interests, especially in the sensitive matters of visitation and defamation. The fact that the visitation case arose

---

[7] Rule 3-310(B) of the State Bar Rules of Professional Conduct (23 West's Ann. Rules, pt. 2 (1981 ed., 1990 cum. supp.) p. 445) provides that an attorney shall not concurrently represent clients whose interests conflict, except with their informed written consent.

[8] Melcher's later representation of Judith Singer for a shoplifting arrest in December 1982 was well after the second trial and so not relevant.

during the first trial, where she *did* testify, does not change the picture. The undisclosed affair with Melcher could easily have stretched already strained loyalty past the breaking point. To those pressures must be added whatever protectiveness Melcher felt from his undisclosed representation of Judith Singer in the crime of murder, which has no statute of limitations (§§ 799, 805).

This bizarre tangle of disclosed and undisclosed potential conflicts, personal and professional, while impossible to completely unravel, does support an informed speculation that Melcher's conduct of the second trial was adversely affected.

## APPEAL ISSUES FOR RETRIAL

Although writ relief moots the appeal issues, we address those which are likely to arise again on retrial.[9]

## I

■ Jurors found "not true" an allegation that defendant himself expected to receive financial gain from the murder but found "true" an alternative allegation that he "intentionally aided, abetted, counselled, commanded,

---

[9] Change of venue, ineffective assistance, the exclusion of testimony and certain instructional issues obviously will arise again, if at all, only in different factual settings.

Whether witness McCarthy was an accomplice or conspirator as a matter of law so as to require instruction to that effect (CALJIC No. 3.16; § 1111) also hinges on particular facts that may differ on retrial. We also note that a witness's denial of accomplice intent usually renders his status to a jury question. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 90-92 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 759-761 [230 Cal.Rptr. 667, 726 P.2d 113].)

Granger's testimony from the first trial was read to the jury on grounds that his assertion of Fifth Amendment privilege rendered him an unavailable witness. (Evid. Code, § 1291.) It was introduced over defense objection that it contained hearsay not falling within the coconspirator exception. (*Id.*, § 1223.) Since Granger's claim of privilege appears to have been based on his pending appeal, which is final now, the issue is not apt to arise again. Also, recent cases hold generally that admitting testimony under the coconspirator exception to the hearsay rule does not violate confrontation rights. (*Bourjaily* v. *United States* (1987) 483 U.S. 171 [97 L.Ed.2d 144, 107 S.Ct. 2775]; *United States* v. *Inadi* (1986) 475 U.S. 387 [89 L.Ed.2d 390, 106 S.Ct. 1121]; cf. *People* v. *Morales* (1989) 48 Cal.3d 527, 552 [257 Cal.Rptr. 64, 770 P.2d 244], cert. den. (1990) __ U.S. __ [107 L.Ed.2d 520, 110 S.Ct. 520].)

Finally, recent cases confirm that there is no sua sponte duty to specially relate the standard accomplice-corroboration instructions to special circumstances. So long as the standard instructions are kept general and not singled out by sequence, argument or other means as applying only to the substantive offense, a reasonable jury will assume that they apply to all findings. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 247-248 [253 Cal.Rptr. 55, 763 P.2d 906], cert. den. (1990) __ U.S. __ [108 L.Ed.2d 634, 110 S.Ct. 1500]; *People* v. *Garrison* (1989) 47 Cal.3d 746, 793-794 [254 Cal.Rptr. 257, 765 P.2d 419].)

induced, solicited, requested or assisted a person who carried out the actual killing for financial gain . . . ." The finding was thus based on section 190.2 subdivision (b), which provides:

"*Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree* shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraphs (1) [murder intentional and carried out for financial gain] . . . of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true." (Italics added.)

Defendant's two-stage attack on the financial-gain finding challenges the statute's application to him as a matter of law and the sufficiency of evidence to support the finding. We address his arguments because, although the evidence might differ somewhat on retrial, it appears likely that a second jury might also find no personal financial stake and that the factual setting would therefore be similar.

### Personal financial motive

The statutory argument is that the statute is ambiguous and therefore must be construed, in defendant's favor, as applying only to an aider and abettor who has some financial motive himself. This argument has been resolved in *People* v. *Freeman* (1987) 193 Cal.App.3d 337 [238 Cal.Rptr. 257], which also involved a defendant who hired the killer and was found not to have had any financial motive himself. Responding to the same arguments and Supreme Court language raised here (see *People* v. *Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]; *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 140-149 [197 Cal.Rptr. 79, 672 P.2d 862]), the Court of Appeal held that reading subdivisions (a)(1) and (b) of the section together makes it "clear that one who intentionally aids or encourages a person in the deliberate killing of another for the killer's own financial gain is subject to the special circumstance punishment." (*People* v. *Freeman, supra,* 193 Cal.App.3d at p. 339.) The court noted, "A person who hires another to kill a third human being has no less moral culpability than the actual killer. In the case of murder-for-hire . . . , but for [the] solicitation and aid the human being killed . . . would still be alive" (*id.,* at p. 340).

### Direct solicitation

The insufficiency-of-the-evidence argument actually poses a second question of statutory interpretation. There is abundant evidence that defendant

solicited and procured the killing. He maintains, however, that the statute only applies where the hirer directly aids and abets the actual killer and that there is no evidence that he aided and abetted Granger, the hit-man, as opposed to Oliver, the intermediary.

We begin by noting that subdivision (b) of section 190.2 differs from the general aiding and abetting statute which uses the terms "aid," "abet," "compel," "advis[e]," "counsel[]" and "encourag[e]," among others. (§ 31.) Subdivision (b) of section 190.2, by contrast, uses all those terms plus "induce[]" and "solicit[]," words which strongly suggest murder *for hire* and the possibility of go-betweens, as opposed to personal involvement with the actual killer. Also, while jurors here were *instructed* that they had to find such a relationship with "a person who carried out the actual killing . . . ," the *statute* speaks of a relationship with "any actor in the commission of [the] murder" (§ 190.2, subd. (b)). "[A]ny actor" could easily include a nonkilling accomplice or coconspirator. (Cf. *People* v. *Silberman* (1989) 212 Cal.App.3d 1099, 1117 [261 Cal.Rptr. 45], cert. den. (1990) __ U.S. __ [108 L.Ed.2d 956, 110 S.Ct. 1827].) Finally, it is hard to see why, as a matter of policy, the Legislature would want to differentiate between a murder for hire where there is no intermediary and one where there is. Apart from possible causation problems where the link between the hirer and actual killer is extremely attenuated (not our case), the moral culpability of the hirer would be the same. (*People* v. *Freeman, supra,* 193 Cal.App.3d 337, 340.) The distinction urged by defendant would tend to snare amateurs while letting practiced killers with impersonal, large networks of thugs off the hook. It hardly makes sense.

Moreover, while the evidence could vary somewhat on retrial, there was evidence that defendant dealt directly with Granger, as the jury apparently found on the given instructions.

On March 21, the day after Oliver and Granger arrived together in San Jose driving the car paid for by defendant for the killing, the car broke down, stranding them in the shopping center lot. By then, Oliver had told Granger that they were not out after a dope dealer, as he originally said, but were out to kill Witkin at the behest of Oliver's boss in Michigan, whom they referred to as "Mr. Big." According to Granger (his prior testimony as read below), Oliver asked him to telephone Mr. Big and ask that he wire them money to get the car fixed. He asked for "Bob" as directed by Oliver, a woman on the other end put a man (defendant) on the phone. When Granger asked if he was Bob, defendant asked who he was. Granger replied that he was an associate of Oliver's, at which point defendant asked him to call back on another line. Granger called, asked "Is this you?" and defendant said yes. (Defendant knew at this point why they were there, of course.)

Granger told him the car had broken down, that they couldn't fix it, and that Gary (Oliver) said to ask for some money so they could leave and just get out of town. Defendant asked "if the job had been done," Granger said "no," and defendant retorted "that he wasn't going to send any money until the job had been done." Granger said, "I'll have to talk to Gary," they said goodbye and he hung up.

This was, of course, a direct contact before the killing. While the immediate object of the phone call was to get money wired for needed car repairs, defendant and Granger knew their respective roles in the murder plan. (Oliver had told defendant that he had someone to do it, and defendant had given him money to carry out the plan.) Implied in defendant's refusal to wire money then was the promise that he would do so when "the job had been done." The "job" was done that night, while they stayed with Maciolek and Smith. Oliver phoned defendant (Bob) early the next morning. Granger got on the line during that call, told him it was done, and defendant said he wanted to send money in Granger's name so that there would be no record of Oliver (his employee) being in San Jose. Granger received a Western Union Moneygram for $600 from Flint, Michigan later that morning.

Defendant urges that the corroborating evidence of the phone call on the morning *after* cannot be relied upon because the jury found untrue the alleged overt act that defendant, "in pursuance of [the] conspiracy and to effect its object," sent money to Santa Clara County that morning. Assuming that another jury might make the same negative finding, it would not mean jurors found that the money was not sent. They could find that the act, which indisputably occurred *after* the object of the conspiracy (Witkin's death) had been accomplished, was not *in furtherance* of the conspiracy.

## II

Codefendant Andrew Granger moved the superior court, during the first trial, to suppress the fruits of his June 5, 1980, police station encounter with police in Michigan, arguing that he was arrested without probable cause or a warrant. Defendant joined in the motion, and it was denied. Defendant claims error, urging that all fruits of Granger's arrest—including statements made by Gary Oliver in response to hearing Granger's statements—should have been suppressed. California law in effect at that time gave defendant standing to object to Fourth Amendment violations of a third person's rights. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1005 [254 Cal.Rptr. 586, 766 P.2d 1]; *In re Lance W.* (1985) 37 Cal.3d 873, 881-884 [210 Cal.Rptr. 631, 694 P.2d 744]; Cal. Const., art. I, § 13.) This issue could arise again.

Rather than burden this opinion with a protracted discussion of the facts and the arguments on both sides, we refer the parties to the record in Granger's appeal, which has been made a part of the record here. The same arguments were raised there, on the same facts. The unpublished opinion authored by Justice Kline for this court on that appeal (Rouse and Miller, JJ., conc.) disposes of all arguments, upholding the trial court's conclusion that Granger consented to go to the station with police and was not arrested. We briefly recapitulate that analysis and, because the opinion was filed nearly seven years ago (Jan. 1984), update it somewhat.

Defendant's argument that the arrest was illegal under *Michigan* cases need not be addressed since California law would control should Michigan case law prove more rigorous than our own. (*People* v. *Orlosky* (1974) 40 Cal.App.3d 935, 938-939 [115 Cal.Rptr. 598]; cf. *People* v. *Blair* (1979) 25 Cal.3d 640, 655-656 [159 Cal.Rptr. 818, 602 P.2d 738].)

■ On review of a superior court's de novo suppression ruling, we resolve conflicts and draw all reasonable inferences in support of the ruling on the facts. Then we independently apply the law to that state of the facts. (*People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].)

■ The superior court's supported conclusion that Granger went *voluntarily* to the Michigan police station completely disposes of the suppression motion and thus makes it unnecessary to detail the disputed evidence about whether the officers involved had probable cause to arrest. The officers differed in their subjective viewpoints on that issue, but the determinative point is whether *a reasonable person in Granger's shoes* would have felt free to say no and walk away. "[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted." (*Michigan* v. *Chesternut* (1988) 486 U.S. 567, 575, fn. 7 [100 L.Ed.2d 565, 573, 108 S.Ct. 1975], citing *United States* v. *Mendenhall* (1980) 446 U.S. 544, 554, fn. 6 [64 L.Ed.2d 497, 509, 100 S.Ct. 1870]; *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 789-790 [195 Cal.Rptr. 671, 670 P.2d 325].) There is no evidence in this record that any of the officers conveyed to defendant their views about whether he would be taken to the station against his will if he did not go voluntarily or be forced to remain there if he chose to leave.

On the question of voluntariness, the evidence is essentially undisputed. The facts come from the two Michigan detectives who brought Granger in for questioning. Their testimony is consistent, and neither Granger nor anyone else gave a different story.

Granger apparently did not know the progress of the investigation, but information from various sources pointed to him as a likely alibi witness for Oliver and Liquai. Michigan detectives Suminski and Schloegel were therefore sent out, on June 5th, to locate Granger and bring him in for questioning. Learning from Granger's mother that her son worked at Paramount Potato Chip Company, the detectives arrived there in an unmarked car at about 3:15 p.m., wearing street clothes.

Granger soon arrived in a company truck driven by his supervisor. The detectives approached Granger as he alit on the passenger side. Suminski said hello, identified himself, asked Granger if he would come with them and, without saying what it was, said they would like to talk to him about something very important. Asking if they were going to the state police post on Corunna Road, defendant said something to the effect: "I'll come along, talk to you because I don't have a car, and that's halfway home, [I'll] thumb a ride home." Suminski went to the supervisor to explain that Granger would be going with them. Following standard procedure for putting someone in the car, Suminski patted down Granger's pockets for weapons (with Granger standing, not placed against the car), and Granger got into the back seat. The officers got into the front; there was no partition between the seats. Granger seemed "quite willing" to go. During the short ride to the station (police post), Granger was advised of his *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed. 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights. At the post, Granger gave Suminski a taped interview (Schloegel was not present) for an hour to an hour and a half in the post commander's office. After Oliver arrived and was separately interviewed, Granger was interviewed again.

We cannot say on this record that the superior court's voluntariness finding is wrong as a matter of law. The officers were not in uniform, seemed to act cordially, used no force or threats, and codefendant, in addition to consenting to go, said he welcomed the partial ride home. The fact that he was taken in the unmarked car and routinely patted down does not compel the conclusion of arrest. (Cf. *People* v. *Davis* (1981) 29 Cal.3d 814, 821-822 [176 Cal. Rptr 521, 633 P.2d 186], distinguishing *Dunaway* v. *New York* (1979) 442 U.S. 200 [60 L.Ed.2d 824, 99 S.Ct. 2248].) As noted in our opinion in the *Granger* appeal, the fact that officers read Granger his *Miranda* rights in the car "can be considered an excess of caution in the event [he] did say anything to incriminate himself, rather than indicating a police perception that he was a prime suspect or was in custody." Denial of the motion was supported.

### DISPOSITION

The petition for writ of habeas corpus in No. A048322 is granted. The judgment of conviction in No. A017290 is vacated and petitioner-defendant

is remanded to the Superior Court of Santa Clara County. Upon finality, the clerk shall remit a certified copy of this opinion and order to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with section 1382, subdivision (b). (*In re Sixto* (1989) 48 Cal.3d 1247, 1265-1266 [259 Cal.Rptr. 491, 774 P.2d 164]; see *In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9 [179 Cal.Rptr. 223, 637 P.2d 690].)

We are required by Business and Professions Code section 6086.7 to report our reversal of the judgment to the State Bar of California for investigation of the appropriateness of initiating disciplinary action against Attorney William C. Melcher. (*In re Sixto, supra,* 48 Cal.3d at p. 1265, fn. 3.)

Benson, J., and Peterson, J., concurred.