**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Owen,* **Slip Opinion No. 2014-Ohio-4597.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-4597

DISCIPLINARY COUNSEL *v.* OWEN.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Owen,* Slip Opinion No. 2014-Ohio-4597.]**

*Attorneys—Misconduct—Sexual relations with wife of client who attorney was representing in death-penalty case—Lawyer who engages in sexual relationship with client's spouse during representation creates inherent and impermissible conflict of interest—Two-year suspension, one year stayed on conditions.*

(No. 2013-1981—Submitted February 5, 2014—Decided October 22, 2014.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 2012-019.

_____

**Per Curiam**.

{¶ 1}  Respondent, James David Owen of Columbus, Ohio, Attorney Registration No. 0003525, was admitted to the practice of law in Ohio in 1979. On April 6, 2012, relator, disciplinary counsel, filed a one-count complaint

charging Owen with violations of the Code of Professional Responsibility[1] alleging that Owen had engaged in misconduct in his representation of Robert Caulley in a criminal matter. Specifically, relator alleged that Owen had had a sexual relationship with Caulley's wife while he represented Caulley in a prosecution for aggravated murder with death-penalty specifications and other offenses, including aggravated robbery.

{¶ 2} Owen stipulated to the material facts of relator's complaint and admitted that his conduct violated DR 5-101(A)(1) (prohibiting a lawyer from accepting employment if the exercise of the lawyer's professional judgment will be or reasonably may be affected by the lawyer's personal interests), 1-102(A)(5) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice), and 1-102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). The parties stipulated that a two-year suspension is the appropriate sanction, but Owen asked that a portion of the suspension be stayed.

{¶ 3} Owen and five other witnesses testified at a hearing before a panel of the Board of Commissioners on Grievances and Discipline. The panel concluded that Owen had violated the above rules and recommended that Owen be suspended from the practice of law in Ohio for two years, with one year stayed on condition that Owen fulfill the terms of his contract with the Ohio Lawyers Assistance Program ("OLAP") and commit no further misconduct. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction.

{¶ 4} Having thoroughly reviewed the record, we adopt the board's findings of fact, conclusions of law, and recommended sanction.

---

[1] Relator charged Owen with misconduct under applicable rules for acts occurring before February 1, 2007, the effective date of the Rules of Professional Conduct, which superseded the Disciplinary Rules of the Code of Professional Responsibility.

**Misconduct**

**{¶ 5}** Owen's law practice consisted primarily of criminal defense, including extensive experience with capital cases. In early January 1997, Owen received a call from Robert Caulley's mother-in-law telling him that Caulley had recently confessed to killing his parents in an apparent robbery in 1994. The Caulleys' estate had been sizeable, and Robert's confession nearly three years after their deaths prompted their executor to threaten to try to recoup the portion of the estate Robert had inherited. Caulley's mother-in-law asked Owen to research and investigate a defense of false confession should the executor file suit, and Owen agreed to do that.

**{¶ 6}** As a result of his confession, Caulley was charged with two counts of aggravated murder with death-penalty specifications and other offenses, including aggravated robbery. Counsel was appointed to defend him in his criminal case. In May 1997, the trial judge, who knew that Owen was working on an aspect of the case, nullified Caulley's indigency status, removed his court-appointed lawyers, and designated Owen as his counsel in the criminal case. Owen officially began representing Caulley, as his sole counsel, in the case in mid-June 1997, and the trial began approximately three months later.

**{¶ 7}** In late June or early July 1997, Caulley's wife relocated from Texas to the Columbus area and immediately began working in Owen's office, assisting with various tasks associated with her husband's case. Approximately a week to ten days before the trial began, Owen and Caulley's wife began a sexual relationship that lasted throughout the trial and continued until late August or early September 1998.

**{¶ 8}** Caulley's trial began on September 12, 1997, and lasted through October 20, 1997. A jury found him not guilty of both the aggravated-murder charges and not guilty of the aggravated-robbery charge. The jury found him guilty of the lesser offenses of voluntary manslaughter in the death of his father

and noncapital murder in his mother's death. Caulley was sentenced to 10 to 25 years' imprisonment on the manslaughter charge and 15 years to life on the murder charge, to be served consecutively. His conviction was affirmed on direct appeal in 2002, *State v. Caulley,* 10th Dist. No. 97AP-1590 (Mar. 14, 2002), and we declined his appeal. 96 Ohio St.3d 1467, 2002-Ohio-3910, 772 N.E.2d 1203. Although Owen worked with Caulley's appellate attorneys, he never told them about his affair with Caulley's wife.

{¶ 9} Owen told his family members about the affair shortly after it ended in late summer 1998. At no point did Owen inform his client, Caulley, of the affair. Instead, Caulley learned about it years later, long after he and his wife were divorced, from his sister and another woman. Caulley assumed that the affair had occurred posttrial, but in January 2011, his former wife told him that it had begun before his trial and continued during and after the trial.

{¶ 10} In April 2011, the Ohio Public Defender called Owen to inform him that Caulley would be filing a motion for a new trial based on Owen's sexual relationship with Mrs. Caulley. Owen admitted to his misconduct and agreed to cooperate in that endeavor. Following that conversation, Owen provided the public defender an affidavit detailing his misconduct that was later filed with Caulley's motion for a new trial. Following a hearing, at which Owen was not called to testify, the court granted the motion. The state moved for leave to appeal the trial court's decision, but the motion was denied by the Tenth District Court of Appeals, and that judgment was affirmed by this court on authority of *State v. Forrest*, 136 Ohio St.3d 134, 2013-Ohio-2409, 991 N.E.2d 1124. 136 Ohio St.3d 325, 2013-Ohio-3673, 995 N.E.2d 227.

{¶ 11} On May 16, 2011, Owen reported his misconduct to relator, and on January 19, 2012, he signed a five-year contract with OLAP. He began treatment with a psychiatrist and psychologist for depression, anxiety, and a previously diagnosed severe attention-deficit disorder ("ADD").

4

{¶ 12} The board adopted these stipulated facts and found that Owen's conduct violated DR 5-101(A)(1), 1-102(A)(5), and 1-102(A)(6) as charged in the complaint.

**Sanction**

{¶ 13} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

{¶ 14} The board found two aggravating factors—a selfish motive and harm to a vulnerable client. *See* BCGD Proc.Reg. 10(B)(1)(b) and (h). As mitigating factors, the board found that Owen had no prior disciplinary record, had provided full and free disclosure to relator and displayed a cooperative attitude toward the disciplinary proceedings, and had a good character and reputation aside from the charged misconduct. *See* BCGD Proc.Reg. 10(B)(2)(a), (d), and (e).

{¶ 15} Owen explained at the disciplinary hearing that the affair came about at a time in which he was representing Caulley in an intense and complicated death-penalty case without the assistance of co-counsel. Although he had known since 1993 that he had ADD and had attempted numerous medications to treat that ailment, he was not taking any prescription medications as he prepared for Caulley's trial because his preferred medication had been found to be lethal to some patients, and nothing else worked. He admitted that he had an alcohol problem and suffered from depression, which, combined with the ADD, not only impaired his judgment and contributed to the decision to start the affair, but also were exacerbated by the stress of the affair.

**{¶ 16}** Throughout the disciplinary process, Owen accepted full responsibility for his misconduct. Although he told his family about the affair, he testified that he did not tell his client because Mrs. Caulley claimed that she had told her husband, her sister-in-law, and her mother. He explained that his focus had been on winning the case, and he convinced himself at the time that because he had done such a good job, the outcome would not have been different even had he admitted the conflict of interest to the court. At his disciplinary hearing, Owen acknowledged that this decision should have been made by the client and that his analysis of the situation had been wrong because his client ultimately did get a new trial.

**{¶ 17}** After Owen admitted the affair to his family, he began seeing a psychiatrist. In 2001 he resumed taking the more effective (but potentially lethal) medication to treat his ADD. When it was taken off the market in 2005, he was once again left without an effective medication for his ADD. When the affair became public, his stress began mounting, and he approached OLAP in 2011, executed a five-year contract, and began seeing a psychiatrist and a psychologist. He continues to see the psychologist twice a month. After the state public defender's inquiry into his conduct, Owen retained counsel and then wrote relator reporting his misconduct. He provided assistance to Caulley's legal team, who succeeded in overturning Caulley's convictions and securing his right to a new trial.

**{¶ 18}** The panel heard testimony from Owen's family therapist and received letters from his psychiatrist and two psychologists, one of whom had performed a neuropsychological assessment of Owen. These professionals provided the clinical perspective to explain why Owen had engaged in an intimate relationship with the wife of his client who was charged with a capital offense. Two attorneys, a current judge, and a former judge testified to Owen's good

character, and he submitted numerous letters attesting to his reputation for skill, diligence, and integrity.

{¶ 19} We understand the effects that mental illness, alcoholism, psychological impairments, and dysfunctional upbringings can have on a practicing attorney, not to mention the stresses attorneys endure in their day-to-day lives, both professional and personal. As debilitating as these can be to practitioners, however, there are consequences when they lead to misconduct, and attorneys will be held accountable. Owen has accepted full responsibility for his misconduct. He acknowledges that he had ample time and opportunity to disclose the affair to Caulley and later to Caulley's appellate attorneys, yet he failed to do so. He is deeply remorseful for his betrayal of his family, his client, and his profession.

{¶ 20} The board recommends that Owen be suspended from the practice of law for two years, with one year stayed on the conditions that he fulfill the terms of his contract with OLAP and commit no further misconduct. The board acknowledged the unusual circumstances presented by this case and noted that it could find no analogous precedent in our prior decisions, though it did find some guidance from other jurisdictions.

{¶ 21} A small body of law exists outside our jurisdiction regarding lawyers who have sexual relations with the spouse of a client. But the parties have not presented, nor have we found, any case law addressing the specific situation presented here—where an attorney has engaged in sexual relations with the spouse of a client while representing the client in a capital case.

{¶ 22} A California appellate court granted a writ of habeas corpus to a criminal defendant who, after being convicted of first-degree murder and conspiracy to commit murder, discovered that his defense attorney had maintained a covert sexual relationship with the defendant's spouse during his first trial and through the guilt phase of the second trial. *People v. Singer*, 226

Cal.App.3d 23, 275 Cal.Rptr. 911 (1990). But it appears that the conduct never resulted in disciplinary action against the attorney. *Id.* at 34 (the attorney's former secretary found, copied, and took to the state bar love letters that the client's wife sent to the attorney, but received no response).

{¶ 23} In *Lawyer Disciplinary Bd. v. Artimez*, 208 W.Va. 288, 540 S.E.2d 156 (2000), a West Virginia lawyer with nearly 20 years of experience began an intimate relationship with the wife of his personal-injury client near the time he filed the client's lawsuit. The wife, who had been the client's girlfriend and driver of the vehicle he occupied at the time of the accident, was a third-party defendant in the action. Two months after the filing of the lawsuit, the client separated from his wife, and the lawyer asked his partner to take over the case, telling both the client and the partner that his heavy workload precluded him from continuing the representation. When his partner asked him whether he was having an affair with the client's wife, the lawyer denied it, but three months later, the client discovered the affair. In exchange for a cash settlement and waiver of his attorney fees, the client signed an agreement promising not to report the lawyer to the Lawyer Disciplinary Board. Despite this agreement, the client reported the lawyer's conduct to the board. The lawyer was charged with violating several rules, including Rule 8.4(d) of the West Virginia Rules of Professional Conduct (prohibiting conduct prejudicial to the administration of justice). The Supreme Court of Appeals of West Virginia found that the attorney violated Rule 8.4(d) by contracting with the client to cover up his unethical behavior. The court imposed a public reprimand and an assessment of costs for that violation.

{¶ 24} With respect to the lawyer's sexual relationship with his client's wife, however, the court noted that no rule directly prohibited an attorney from engaging in a sexual relationship with the client's spouse. *Id.* at 301. And while the court found that the lawyer's conduct "implicated" Rule 1.7(b), regarding conflicts of interest between a lawyer and client, *id.,* it found that the lawyer

"reasonably did not believe his representation of [the client] to be adversely affected by [the] affair," *id.* at 302, and "[g]iven the novelty of this charge and the fact that lawyers are generally entrusted with resolving the conflicts of interest which they inevitably encounter," declined to impose further discipline based upon the affair. *Id.* at 301.

{¶ 25} In *In re Disciplinary Proceedings Against Gamino*, 286 Wis.2d 558, 707 N.W.2d 132 (2005), an attorney was found to have violated Wisconsin's rules of professional conduct by engaging in sexual relations with two female clients. One of the clients was dealing with drug and alcohol dependency and facing multiple criminal charges and the loss of her children; the other was the mother of a juvenile client. The Supreme Court of Wisconsin found that the attorney's conduct with the juvenile client's mother violated Wis.S.Ct.R. 20:1.7(b), which at that time prohibited a lawyer from representing a client if the lawyer's own interests may materially limit that representation, unless the lawyer reasonably believes that the representation will not be adversely affected and the client consents in writing after consultation. The court further found that by lying to disciplinary authorities about the nature of the relationship with the juvenile client's mother, the lawyer violated Wis.S.Ct.R. 20:3.3(a)(1) (prohibiting a lawyer from knowingly making a false statement of fact or law to a tribunal). The court further found that his affair with the other vulnerable client violated Wis.S.Ct.R. 20:1.8(k)(2) (now (j)) (prohibiting a lawyer from engaging in a consensual sexual relationship with a client unless the relationship predates the representation). The court found that this troubling pattern of misconduct warranted "significant discipline" and suspended the attorney's license to practice law for six months. *Id.* at ¶ 56-57.

{¶ 26} In another Wisconsin case, *In re Disciplinary Proceedings Against Inglimo*, 305 Wis.2d 71, 740 N.W.2d 125 (2007), the attorney's misconduct included two sexual relationships with the wife or girlfriend of a client, both of

which involved having sex in the presence of the client. *Id.* at ¶ 7-8, 36-39, 71-72. In a different representation, the attorney engaged in an improper substantial social relationship with a divorce client's wife (i.e., the opposing party in the divorce proceeding). *Id.* at ¶ 21-25, 70. The court also found that the attorney had committed several trust-account violations involving dishonesty and misrepresentation, and that he had engaged in conduct that adversely reflected on his fitness to practice by possessing marijuana and delivering it to and using it with his clients. The court suspended Inglimo's law license for three years based on these ethical transgressions. *Id.* at ¶ 97.

{¶ 27} South Carolina has a number of court decisions in civil matters in which attorneys were disciplined for engaging in sexual relationships with the spouses of clients. In *In re Anonymous Member of South Carolina Bar*, 389 S.C. 462, 699 S.E.2d 693 (2010), the Supreme Court of South Carolina admonished an attorney who engaged in a sexual relationship with a client's wife and held that such conduct constitutes a per se violation of S.C.Prof.Cond.R. 1.7. In *In re Munden*, 348 S.C. 231, 559 S.E.2d 589 (2002), and *In re Reynolds*, 335 S.C. 165, 515 S.E.2d 927 (1999), the court publicly reprimanded two attorneys—one who entered into an adulterous relationship with a client's spouse and another who had sex with a client's wife on a single occasion, but also entered into a business relationship with the client without making required disclosures. And in *In re Hawkins*, 320 S.C. 57, 463 S.E.2d 92 (1995), the court suspended an attorney from the practice of law for six months for accepting employment as vice president and general counsel of a company owned by his paramour's husband and then giving the husband legal advice that proved detrimental to the husband's financial interests in his ensuing divorce. The court held that by these actions, the lawyer violated rules prohibiting conflicts of interest and dishonesty, deceit, and misrepresentation.

10

**{¶ 28}** And in at least one jurisdiction, an attorney has been disciplined for making sexual advances to a client's spouse in a telephone conversation. *See People v. Bauder*, 941 P.2d 282 (Colo.1997) (publicly censuring attorney who solicited prostitution during telephone call with wife of his client in dissolution of marriage).

**{¶ 29}** Our Rules of Professional Conduct do not specifically address the subject of a lawyer having sexual relations with the spouse of a client. As in these other jurisdictions, however, we find that a lawyer's sexual relationship with the spouse of a current client creates an inherent conflict of interest. This conflict of interest compromises the relationship of trust and confidence between the attorney and client. *Artimez,* 208 W.Va. at 300, 540 S.E.2d 156; *In re Anonymous,* 389 S.C. at 465-466, 699 S.E.2d 693. An intimate relationship of this nature necessarily implicates our rules governing the acceptance or continuation of legal representation when the lawyer's ability to exercise independent professional judgment on the client's behalf may be compromised, *see* DR 5-101(A)(1) (for conduct occurring before February 1, 2007), or if there is a substantial risk that the lawyer's ability to represent the client will be materially limited by the lawyer's responsibilities to a third person or by the lawyer's own personal interests, *see* Prof. Cond.R. 1.7(a)(2) and (b) (for conduct occurring on or after February 1, 2007).

**{¶ 30}** As to attorneys' sexual relationships with clients, "[w]e have consistently disapproved of lawyers engaging in sexual conduct with clients where the sexual relationship arises from and occurs during the attorney-client relationship." *Cleveland Bar Assn. v. Kodish*, 110 Ohio St.3d 162, 2006-Ohio-4090, 852 N.E.2d 160, ¶ 66 (citing cases). And in the context of representing a client in a criminal matter, we have emphasized:

> The client's reliance on the ability of her counsel in a crisis situation has the effect of putting the lawyer in a position of dominance and the client in a position of dependence and vulnerability. The more vulnerable the client, the heavier is the obligation upon the attorney not to exploit the situation for his own advantage. Whether a client consents to or initiates sexual activity with the lawyer, the burden is on the lawyer to ensure that all attorney-client dealings remain on a professional level.

*Disciplinary Counsel v. Booher*, 75 Ohio St.3d 509, 510, 664 N.E.2d 522 (1996). We see no reason to deviate from these principles when the sexual conduct is with the spouse of a client rather than the client, for the vulnerability of the client and the betrayal of trust are the same.

{¶ 31} The defendant in a criminal matter is particularly vulnerable, and especially so in a capital case, in which the client's life is at risk. The defendant's spouse in such a case is also very vulnerable. The sexual relationship intrudes into the marriage, subjects the client to a double betrayal by the spouse and by the lawyer, destroys the trust essential to the attorney-client relationship, erodes public confidence in the integrity of the legal profession, and undermines the lawyer's loyalty to the client. In granting a writ of habeas corpus to a man convicted of first-degree murder, whose wife had engaged in a sexual relationship with his attorney, a California appellate court recognized:

> [T]he relationship here between defense counsel and defendant's wife deprived defendant of his constitutional right to the "undivided loyalty and effort" of his attorney. The validity of our adversarial system depends upon the guaranty of this "undivided loyalty and effort" for every criminal defendant. Given the instant

facts, a defense attorney, in the extreme, might be influenced to see his client convicted and imprisoned so that the affair can continue or remain undiscovered. More subtle influences could arise where the wife is a potential witness in the case * * *. Reluctance to call or engage in abrasive confrontation with a witness could jeopardize a case as easily as reluctance to vigorously oppose counsel on the other side. The attorney could be tempted to avoid calling a witness who might impugn his lover's integrity or implicate him or her in the case. Also, it is logical to speculate* * * that a defense attorney might forego trial strategies that would impose a costly burden on his lover. In other words, defense counsel might "pull his punches." Any of these considerations could jeopardize the duty of undivided loyalty owed the client.

(Citation omitted.) *People v. Singer*, 226 Cal.App.3d at 40, 275 Cal.Rptr. 911.

{¶ 32} We agree that the lawyer who engages in a sexual relationship with a client's spouse during the representation creates an inherent and impermissible conflict between the interests of the lawyer and those of the client. This conflict violates the client's constitutional right to the effective assistance of counsel, *id.,* and undermines public confidence in the criminal justice system. Therefore, we find that Owen's conduct in this matter necessarily violates DR 5-101(A)(1), 1-102(A)(5), and 1-102(A)(6).[2]

---

[2] As noted earlier, relator charged Owen with violations of the Disciplinary Rules of the Code of Professional Responsibility because his conduct occurred before February 1, 2007, the effective date of the Rules of Professional Conduct, which superseded the Code of Professional Responsibility. The conduct portrayed in this case is now regulated by Prof.Cond.R. 1.7(a)(2) (prohibiting representation if a lawyer's personal interests will materially limit his ability to carry out appropriate action for the client), 1.7(b) (prohibiting the continued representation of a client if a conflict of interest would be created, unless the affected client gives informed consent in

**{¶ 33}** The parties have stipulated and the board has found that Owen has no prior disciplinary record, that he provided free disclosure to relator during the investigation and has displayed a cooperative attitude toward the disciplinary proceedings, and that he has demonstrated his good character and reputation. The record contains numerous attestations from attorneys, members of the community, and judges, including a letter from the founder of an organization whose mission is to free from prison those who have been falsely convicted—a cause to which Owen has dedicated a substantial amount of time.

**{¶ 34}** In light of these findings, the case law discussed above, and Owen's 35-year career representing underserved populations, we believe that the board's recommended sanction—a two-year suspension, with the second year stayed on the conditions that Owen fulfill the terms of his contract with OLAP and commit no further misconduct—will adequately protect the public from future harm.

**{¶ 35}** Accordingly, we suspend James David Owen for two years, with the second year stayed on the conditions that he fulfill his contract with OLAP and engage in no further misconduct. If Owen fails to comply with the conditions of the stay, the stay will be lifted, and he will serve the full two-year suspension. Costs are taxed to Owen.

Judgment accordingly.

PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

O'CONNOR, C.J., dissents and would impose an indefinite suspension.

_____

writing), 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice), and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

Scott J. Drexel, Disciplinary Counsel, and Joseph M. Caligiuri, Chief Assistant Disciplinary Counsel, for relator.

Kegler, Brown, Hill & Ritter, Geoffrey Stern, and Rasheeda Khan, for respondent.

_____