**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Carter*, **Slip Opinion No. 2023-Ohio-3992.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-3992

DISCIPLINARY COUNSEL *v*. CARTER.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Carter*, Slip Opinion No. 2023-Ohio-3992.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct—Two-year suspension with one year conditionally stayed.*

(No. 2023-0169—Submitted May 2, 2023—Decided November 7, 2023.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2022-027.

_____

**Per Curiam.**

{¶ 1} Respondent, Gregory Erwin Carter, of Newark, Ohio, Attorney Registration No. 0038953, was admitted to the practice of law in Ohio in 1987.

{¶ 2} In a June 2022 complaint, relator, disciplinary counsel, charged Carter with five ethical violations arising from his conduct during his representation of an incarcerated person who sought judicial release. Specifically, the charges related

to Carter's mishandling of the client's advance fees, his sexual conduct with the mother of the client's child, and his false statements to a law-enforcement officer who was investigating that sexual conduct.

{¶ 3} At a hearing before a three-member panel of the Board of Professional Conduct, the parties presented stipulations of fact, one rule violation (Prof.Cond.R. 8.4(c)), and mitigating factors. The panel also heard testimony from Carter and J.G., the mother of the client's child.[1] The panel issued a report in which it made findings of fact, unanimously dismissed two alleged rule violations due to insufficient evidence, and found that the three remaining violations, of Prof.Cond.R. 1.15(a), Prof.Cond.R. 8.4(c), and Prof.Cond.R. 8.4(h), were proved by clear and convincing evidence. The panel recommended that Carter be suspended from the practice of law for six months and that his reinstatement be conditioned on his submission of proof that he has completed at least six hours of continuing legal education ("CLE") focused on professionalism and appropriate client relationships, with at least three of those hours to include sexual-harassment training. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction.

{¶ 4} Carter objects to the board's findings of fact regarding his sexual conduct, disputes its finding under Prof.Cond.R. 8.4(h) that his sexual conduct adversely reflects on his fitness to practice law, and argues that a fully stayed six-month suspension is the appropriate sanction for his engaging in dishonesty in the scope of a law-enforcement investigation. For the reasons that follow, we overrule Carter's objections, adopt the board's findings of misconduct, and find that a two-year suspension, with one year conditionally stayed, is the appropriate sanction for Carter's misconduct.

---

1. Given the nature of this alleged misconduct, the panel chair granted relator's unopposed motion to identify J.G. in the public record by her initials.

## I. MISCONDUCT

### A. The board's findings

{¶ 5} In November 2018, Eric McClain was convicted and sentenced to prison in three separate criminal cases in the Licking County Court of Common Pleas. In the first case, McClain pleaded guilty to a single count of aggravated trafficking in drugs and was sentenced to a two-year prison term by Judge David Branstool. In the second case, McClain pleaded guilty to a single count of aggravated possession of drugs. And in the third case, McClain pleaded guilty to a single count of breaking and entering. In the second and third cases, Judge Thomas Marcelain imposed prison terms of two years and one year, respectively, and ordered the sentences to be served concurrently with each other but consecutively to the prison term imposed by Judge Branstool in the first case.

{¶ 6} In early 2020, McClain asked Carter to seek judicial release on his behalf. Carter met with Debbie Fabian, McClain's mother, and J.G., the mother of McClain's child, to discuss McClain's case. Fabian executed a fee agreement that provided for a flat fee of $500 for Carter to prepare and file motions for judicial release—J.G. had no part in the contract. During that meeting, J.G. expressed her hope that for the benefit of their child, McClain would be granted judicial release. Carter boasted that he was very connected in the community and with the judges and told Fabian and J.G. that they were lucky to receive his services so cheaply.

{¶ 7} With the exception of her attending the initial meeting with Carter, J.G. was not involved in McClain's quest for judicial release. However, two days after that meeting, Carter called J.G. and left her a voicemail message stating that the $500 fee payment would be kept in trust until the work was performed on the motions. He explained that if the need arose, he would be able to issue a refund. Despite Carter's representations, he never deposited the fee regarding McClain's case into his client trust account.

**{¶ 8}** Carter filed the motions for McClain's judicial release in April 2020. Two months before McClain's initial prison term ended, Judge Branstool granted Carter's motion for judicial release. However, Judge Marcelain had already denied the motions filed in the cases assigned to him because the motions were not yet ripe.

**{¶ 9}** In July 2020, Fabian paid Carter an additional $300 to refile the motions for judicial release, but as with the $500 he previously received from Fabian, Carter did not deposit those funds into his client trust account. A few days after receiving that payment, Carter sent a text message to J.G. in which he identified himself as McClain's lawyer and asked if she had time to come to his office that day. He did not invite Fabian.

**{¶ 10}** J.G. agreed to meet with Carter. Because she was a single parent, J.G. took her four children to Carter's office and left them in the car, with her 16-year-old daughter supervising. J.G. testified that before entering Carter's office, she set her cellphone to record the conversation so that she could relay the information to Fabian. Upon entering Carter's office, J.G. remarked on the smell of essential oils. Carter replied that one of the scents was called "slim and sexy" and told J.G. that she "[didn't] need any more of that." He also told J.G., "I was just trying to get you up here."

**{¶ 11}** J.G. inquired about McClain's chances of obtaining judicial release, stating that she needed him out of prison and at home. Carter told her that he did not know whether the motions would be granted but that he would try his best. While Carter read the draft of the second motion out loud to J.G., she felt very anxious and took some antianxiety medication. Carter finished reading the motion and then, while gesturing to his lips or cheek, asked J.G. whether he could have his "reward."

**{¶ 12}** The board found that Carter then got up from behind his desk and approached J.G., who was scared. J.G. testified and the board found that Carter

4

then put his hands on J.G.'s head and shoved her head into his genitals. J.G. performed fellatio on Carter. The board further found that Carter had also tried to pull J.G. onto the desk by her pants. At that point, she stopped and told Carter, "I can't do this anymore," and her recording stopped shortly thereafter. Before J.G. walked out of Carter's office, he used his cellphone camera to take two pictures of her.

{¶ 13} The next day, Carter left J.G. a voicemail message asking J.G. for her father's phone number, which he intended to include in the motions for judicial release because J.G.'s father had agreed to employ McClain upon his release from prison. Carter refiled the motions in the two cases assigned to Judge Marcelain, and the judge denied them a second time. Carter acknowledged that the motions were premature and agreed to refile them at no charge, which he did in December 2020.

{¶ 14} Carter did not disclose his conduct with J.G. to McClain, but after the court denied McClain's motions for judicial release a third time in February 2021, J.G. told McClain what had happened. McClain then wrote to Carter, expressing his dissatisfaction with Carter's legal representation and his conduct with J.G. He also wrote to the Licking County Bar Association, alleging that Carter had assaulted J.G.

{¶ 15} In April 2021, the Newark Police Department opened an investigation into Carter's conduct. During a phone interview with the investigating detective, Carter lied, denying that he had had any sexual contact with J.G. but claiming that "she made advances" and that he "did not reciprocate to that." After the detective informed Carter that he had listened to J.G.'s 24-minute recording of their meeting, Carter admitted that J.G. had performed fellatio on him at his law office. He stated that he had not asked her to do it, that she did it of her own accord, and that the conduct was consensual. He described J.G. as the instigator but admitted to the detective that his conduct was "definitely" unethical.

He also told the detective that he was not initially truthful because he was concerned that the incident would affect his law license.

{¶ 16} The parties stipulated that Carter violated Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The board agreed. It also found that Carter's failure to deposit Fabian's payments into his client trust account violated Prof.Cond.R. 1.15(a) (requiring a lawyer to hold the property of clients in an interest-bearing client trust account, separately from the lawyer's own property). And based on findings that Carter had enticed J.G. to his law office under the false pretense of meeting to discuss McClain's case and that Carter had sought a sex act as a "reward" for his legal work, the board also found that Carter violated Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law, even though that conduct is not expressly prohibited by another rule). *See Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21.

### B. The board's findings of fact are supported by the evidence

{¶ 17} In his first objection, Carter disputes the board's findings that (1) J.G. was scared during their sexual encounter, (2) he put his hands on J.G.'s head and shoved her head into his genitals, and (3) he attempted to pull J.G. onto the desk by her pants. Carter acknowledges that J.G. testified to those facts at his disciplinary hearing, but he argues that his testimony, the photographs that he took of J.G., and her recording of the incident disprove what he terms her "allegations." Carter asserts that there was mutual flirtation between himself and J.G. after their initial meeting and that her testimony that she was scared during the July 2020 encounter was contradicted by her demeanor in the photographs he took of her as she left his office. He maintains that she was free to decline his invitation and to walk out of his office at any time. In addition, he argues that J.G.'s testimony that he put his hands on her head and shoved her head into his genitals "implies a sexual

assault" that is contradicted by the recording of the incident and the absence of criminal charges against him.

{¶ 18} During the disciplinary hearing, Carter and J.G. offered conflicting accounts of their July 2020 encounter in Carter's office. However, "it is of no consequence that the board's findings of fact are in contravention of [the] respondent's or any other witness's testimony. 'Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.' " *Disciplinary Counsel v. Zingarelli*, 89 Ohio St.3d 210, 217, 729 N.E.2d 1167 (2000), quoting *Cross v. Ledford*, 161 Ohio St. 469, 478, 120 N.E.2d 118 (1954). "Unless the record weighs heavily against a hearing panel's findings, we defer to the panel's credibility determinations, inasmuch as the panel members saw and heard the witnesses firsthand." *Cuyahoga Cty. Bar Assn. v. Wise*, 108 Ohio St.3d 164, 2006-Ohio-550, 842 N.E.2d 35, ¶ 24.

{¶ 19} In this case, the findings of the panel and the board demonstrate that the panel found J.G.'s testimony to be more credible than that of Carter. Indeed, J.G. testified that she went to Carter's office—with her four children in tow—to discuss McClain's case. She expected to be there for only 10 to 15 minutes, as she was on her way to a family birthday celebration. Although Carter maintains that J.G. was the instigator, he admitted in his testimony before the panel that he had invited J.G. to his office for personal reasons, that he had "slim and sexy" essential oils wafting through his office when she arrived, and that he solicited intimate contact from J.G. as a "reward" for the motions he had prepared on McClain's behalf.

{¶ 20} While Carter maintains that J.G. was free to leave at any time, J.G. testified that she felt intimidated by Carter's status in the community and that she was upset, nervous, and "freaking out" from the moment he made the inappropriate comment about the name of the essential oil. Indeed, Carter stipulated that J.G. "took a dose of antianxiety medication while [he] was reading the draft motion

because she was feeling nervous and anxious." And while the audio recording is largely silent for approximately 90 seconds before J.G. says, "I can't do this anymore," that silence is not inconsistent with J.G.'s testimony about the incident.

{¶ 21} Furthermore, J.G.'s demeanor in the photographs that Carter took as she was leaving his office does not contradict her testimony that she was scared. On the contrary, the photograph depicting her with her arms out to her sides and her tongue between her lips could be interpreted as someone trying to lighten the mood in a stressful situation, which is supported by her testimony that she was scared when she took the photo because Carter had told her to turn around and that she thought he had a gun, and that when she realized he was taking a picture, she tried to stick her tongue out because she was mad and relieved to be getting out alive. And credibility determinations are for the trier of fact. *Zingarelli*, 89 Ohio St.3d at 217, 729 N.E.2d 1167.

{¶ 22} Carter maintains that because the state declined to press charges against him, it "clearly found that any allegation that the sexual conduct was not consensual lacked credibility." But a letter submitted to disciplinary counsel by the county prosecutor's office with a copy of their investigatory file merely states that the prosecutor's office "reviewed the evidence provided to [it] and declined to press charges due to insufficient evidence." The fact that the prosecutor did not believe that there was enough evidence to prove the commission of a crime beyond a reasonable doubt has no bearing on our assessment of whether Carter's professional misconduct has been proved in this case by the lesser evidentiary standard of clear and convincing evidence. *See* Gov.Bar R. V(12)(I) (requiring professional misconduct of attorneys to be proved by clear and convincing evidence). Moreover, the only evidence of the police investigation in the record is the audio recordings of Carter's two investigatory interviews with a police detective— including the interview in which Carter lied about having had sexual contact with J.G. until he was confronted with the audio recording of the encounter.

8

{¶ 23} On these facts, we conclude that the record does not weigh heavily against the panel's determination that J.G.'s testimony was more credible than Carter's. We therefore overrule Carter's first objection.

## C. The board's finding that Carter violated Prof.Cond.R. 8.4(h) is supported by clear and convincing evidence

{¶ 24} In his second objection, Carter notes that he and J.G. were both unmarried and consenting adults, that J.G. was not his client, and that she did not employ him to represent McClain. Based on those facts, he asserts that his sexual conduct with J.G. could not adversely reflect on his fitness to practice law in violation of Prof.Cond.R. 8.4(h), because it created no conflict of interest, had no impact on the work he performed in McClain's case, and compromised no duty to McClain.

{¶ 25} Carter's attempts to paint his conduct with J.G. as a consensual encounter entirely unrelated to his practice of law and his representation of McClain are disingenuous. It is true that the panel unanimously dismissed two alleged rule violations concerning purported conflicts of interest created by Carter's sexual conduct with J.G. However, the board found that Carter engaged in conduct that adversely reflected on his fitness to practice law by luring J.G. to his law office under the false pretense of discussing McClain's case. Once J.G. was in his office, he read her his work product, and after receiving her praise for a job well done, sought a sexual act as a "reward" for his legal work.

{¶ 26} Carter has admitted that he did not know J.G. until he met with her and Fabian to discuss McClain's motions for judicial release. Carter further admitted that J.G. had an interest in the outcome of the proceedings because she needed McClain home to help her care for their child. Carter fails to appreciate that he took advantage of his attorney-client relationship with McClain and J.G.'s vulnerability to secure his own sexual gratification—he testified in his deposition and at his disciplinary hearing that he was "miffed" when she abruptly stopped

performing the sex act, because he could not understand "why she would ask to do that and then just say, 'Hey, I can't do that anymore.' " The board has found as fact that Carter deceived J.G. into meeting with him and that he sought sex as a "reward" for his legal work. Even now, Carter exhibits a disturbing inability or unwillingness to consider the possibility that J.G.'s conduct was the product of his coercion rather than her freely given consent.

{¶ 27} This court has held that a lawyer's inappropriate touching or sexual commentary—whether directed toward clients, witnesses, or others affiliated with the lawyer's office or cases—undermines confidence in the legal profession and adversely reflects on the attorney's fitness to practice law. For example, in *Lake Cty. Bar Assn. v. Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, we found that a violation of Prof.Cond.R. 8.4(h) occurred when an attorney sent sexually explicit text messages to—and sought sexual favors from—a law student in his employ. We have similarly found a violation of the rule when, in a recorded telephone conversation, an attorney asked the client about her breast size, suggested that she should reward him by showing him her breasts, and proposed that she perform oral sex on him after he opined that he was receiving little compensation for his work—even though the attorney never touched the client. *Akron Bar Assn. v. Miller*, 130 Ohio St.3d 1, 2011-Ohio-4412, 955 N.E.2d 359, ¶ 6, 19. We have also found multiple violations of a precursor to Prof.Cond.R. 8.4(h) when an attorney made sexualized comments to a law-enforcement officer, a potential witness, and multiple clients and inappropriately touched several of them. *See Cleveland Metro. Bar Assn. v. Lockshin*, 125 Ohio St.3d 529, 2010-Ohio-2207, 929 N.E.2d 1028.

{¶ 28} Based on this precedent and the facts described above, we conclude that there is clear and convincing evidence to support the board's finding that Carter violated Prof.Cond.R. 8.4(h). We therefore overrule Carter's second objection and

find that Carter's conduct with J.G. adversely reflects on his fitness to practice law in violation of Prof.Cond.R. 8.4(h).

## II. SANCTION

### A. The board's recommendation

**{¶ 29}** When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties the attorney violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

**{¶ 30}** The board found that three aggravating factors are present in this case—Carter acted with a selfish motive, committed multiple offenses, and caused harm to J.G., who was vulnerable. *See* Gov.Bar R. V(13)(B)(2), (4), and (8). As for mitigating factors, the board adopted the parties' stipulations that Carter has a clean disciplinary record and exhibited a cooperative attitude toward the disciplinary proceedings. *See* Gov.Bar R. V(13)(C)(1) and (4).

**{¶ 31}** In determining the appropriate sanction for Carter's misconduct, the board began with the fundamental precept that the primary purpose of attorney discipline is not to punish the offender but to protect the public against members of the bar who are unworthy of the trust and confidence essential to the attorney-client relationship. *See, e.g.*, *Disciplinary Counsel v. Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368, ¶ 10. The board further acknowledged that Carter stipulated to a violation of Prof.Cond.R. 8.4(c) and that there is a rebuttable presumption that he will serve an actual suspension from the practice of law for that violation. *See, e.g.*, *Disciplinary Counsel v. Fowerbaugh*, 74 Ohio St.3d 187, 190, 658 N.E.2d 237 (1995) ("When an attorney engages in a course of conduct [involving dishonesty, fraud, deceit, or misrepresentation], the attorney will be actually suspended from the practice of law for an appropriate period of time"); *Disciplinary Counsel v. Proctor*, 131 Ohio St.3d 215, 2012-Ohio-684, 963 N.E.2d

806, ¶ 18 (recognizing that the presumptive sanction established in *Fowerbaugh* may be overcome by significant mitigating evidence).

{¶ 32} The board considered several cases in which we imposed partially stayed suspensions on attorneys who engaged in inappropriate sexual conduct. *See Disciplinary Counsel v. Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775 (imposing a one-year suspension, with six months conditionally stayed, on an attorney who verbally attacked and sexually harassed an employee); *Disciplinary Counsel v. Leon*, 155 Ohio St.3d 582, 2018-Ohio-5090, 122 N.E.3d 1242 (imposing a one-year suspension, with six months conditionally stayed, on an attorney who represented a husband and wife in bankruptcy proceedings and began a sexual relationship with the wife during the course of the representation); *Disciplinary Counsel v. Owen*, 142 Ohio St.3d 323, 2014-Ohio-4597, 30 N.E.3d 910 (imposing a two-year suspension, with one year conditionally stayed, on an attorney who engaged in a sexual relationship with the spouse of a client who faced aggravated-murder charges with death-penalty specifications). The board also considered the sanctions imposed in cases in which attorneys had lied to law-enforcement officers during criminal investigations. *See, e.g.*, *Lorain Cty. Bar Assn. v. Lewis*, 152 Ohio St.3d 614, 2018-Ohio-2024, 99 N.E.3d 404 (imposing a two-year suspension, with six months conditionally stayed, on an attorney who left the scene of a motor-vehicle accident after a night of drinking and was later convicted of obstructing official business for submitting a false witness statement to police).

{¶ 33} After considering the facts of this case and that precedent, the board recommends that we suspend Carter from the practice of law for six months and order him, as a condition of reinstatement, to submit proof that he has completed a minimum of six hours of CLE in the areas of professionalism and appropriate client relationships, with at least three of those hours to include sexual-harassment training.

## B. Carter's misconduct warrants an actual suspension

{¶ 34} Carter objects to the board's recommended sanction. In addition to his assertion that he did not violate Prof.Cond.R. 8.4(h), he argues that a fully stayed six-month suspension is the appropriate sanction for his violations of Prof.Cond.R. 1.15(a) and 8.4(c). In support of his argument, he asserts that the rebuttable presumption of an actual suspension discussed in *Fowerbaugh*, 74 Ohio St.3d 187, 190, 658 N.E.2d 237, applies only to attorneys who have engaged in a course of conduct involving dishonesty, fraud, deceit, or misrepresentation. Carter asserts that while Fowerbaugh repeatedly lied to a client about the status of the client's legal matter, his own misconduct consisted of his failure to deposit Fabian's advance fee into his client trust account and a single incident of deceit that was corrected in the same conversation in which it was made. He further emphasizes that his deceit had no impact on his client.

{¶ 35} Although Carter did not engage in a pattern of dishonest conduct, we have imposed an actual suspension on an attorney who engaged in misconduct that included a single incident of making a false statement to law-enforcement officers. For example, in *Lewis*, 152 Ohio St.3d 614, 2018-Ohio-2024, 99 N.E.3d 404, at ¶ 4, an attorney with a record of prior discipline had left the scene of an auto accident after a night of drinking. The attorney, Lewis, was thereafter convicted of obstructing official business for submitting a false witness statement to police in which he claimed that an unknown African American man had been driving the car at the time of the accident, when, in fact, Lewis's companion had been at the wheel. *Id*. at ¶ 5-6. Lewis stipulated that his false statement to law enforcement violated three disciplinary rules, including Prof.Cond.R. 8.4(c). *Lewis* at ¶ 9. He also accepted responsibility and showed remorse for his misconduct. *Id*. at ¶ 12. We imposed a two-year suspension, with six months conditionally stayed, for Lewis's deceitful conduct. *Id*. at ¶ 17.

**{¶ 36}** Even if we were to accept that Carter's deceit in this case is insufficient to warrant an actual suspension from the practice of law, Carter's proposed sanction fails to account for his abuse of his attorney-client relationship with McClain to manipulate J.G. and lure her to his office to seek sexual favors as a reward for his legal services. It also fails to account for his use of some degree of physical force during the encounter. Indeed, Carter's request for a stayed suspension exhibits a disturbing refusal to acknowledge the seriousness and wrongfulness of his misconduct with J.G. and a complete lack of remorse for his actions. These factors render Carter's case more comparable to cases in which we have imposed actual suspensions for sexually charged misconduct.

**{¶ 37}** For example, in *Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775, an attorney had verbally harassed his paralegal for nearly two and a half years, calling her and her family names, hurling insults about her appearance, and using foul language to criticize her education in front of other attorneys. *Id*. at ¶ 4-5. The attorney, Skolnick, also sexually harassed the paralegal and another employee while driving them to lunch, suggesting that they perform a sex act on him as he drove so that he could rate their performance on a scale from one to ten. *Id*. at ¶ 5. Unlike Carter, Skolnick presented evidence of his good character, acknowledged his misconduct, and expressed remorse for his behavior. *Id*. at ¶ 9. We suspended Skolnick for one year with six months conditionally stayed. *Id*. at ¶ 15.

**{¶ 38}** In *Leon*, 155 Ohio St.3d 582, 2018-Ohio-5090, 122 N.E.3d 1242, at ¶ 7, 18, we also imposed a partially stayed one-year suspension on an attorney who had created a conflict of interest by engaging in a sexual relationship with a client while he represented that client and her husband in a bankruptcy proceeding. The board determined that the attorney, Leon, neglected the clients' legal matter, failed to deposit their advanced fees into his client trust account, and failed to issue a refund upon his withdrawal from the representation. *Id*. at ¶ 5-8. The aggravating

factors consisted of Leon's selfish motive, multiple rule violations, and harm to vulnerable clients. *Id*. at ¶ 11. As for mitigation, Leon had no prior discipline, exhibited a cooperative attitude toward the disciplinary proceedings, and presented evidence of his good character and reputation. *Id*. at ¶ 12.

**{¶ 39}** We recently addressed the misconduct of an attorney who had engaged in a sexual relationship with a client for several months before withdrawing from her case. *Disciplinary Counsel v. Noble*, 169 Ohio St.3d 350, 2022-Ohio-2190, 204 N.E.3d 527, ¶ 4-6. The attorney, Noble, also falsely denied the existence of that relationship when filing a police report alleging that the client's ex-husband was harassing Noble's ex-wife. *Id*. at ¶ 15. Although Noble was charged with misdemeanor counts of falsification and making a false alarm, the charges were ultimately dismissed. *Id*. at ¶ 18. During a hearing on his petition to seal the record in the dismissed criminal case, however, he lied to the tribunal by falsely testifying that he had not lied to the police, though he later admitted his deceit. *Id*. at ¶ 19. In contrast to Carter, Noble stipulated to the charged misconduct, accepted responsibility, and expressed genuine remorse for his actions. *Id*. at ¶ 7, 20, 23. We suspended him from the practice of law for one year with six months conditionally stayed. *Id*. at ¶ 33.

**{¶ 40}** We also find our recent decision in *Disciplinary Counsel v. Russ*, __ Ohio St.3d __, 2023-Ohio-1337, __ N.E.3d __, to be particularly instructive. In *Russ*, we imposed at two-year suspension, with one year conditionally stayed, on an attorney who made multiple sexual advances toward a vulnerable client by text message, though no physical sexual activity ever occurred. *Id*. at ¶ 5-8, 23. In response to the relator's letter of inquiry regarding his conduct in that case, the attorney, Russ, denied the allegations against him and attempted to shift blame to his client until he discovered that relator had obtained copies of the text-message exchange. *Id*. at ¶ 10-11. Russ was also late to six hearings and failed to attend four others over a nine-month period. *Id*. at ¶ 13. In addition to other aggravating

factors, we found that Russ engaged in a pattern of misconduct and made false statements during the disciplinary process. *Id*. at ¶ 16. In contrast to Carter, however, Russ was found to be genuinely remorseful for his misconduct during his disciplinary hearing.

{¶ 41} In this case, Carter exploited his attorney-client relationship with his incarcerated client, McClain, by luring J.G., the mother of McClain's young child, to his office and by coercing her into engaging in a sexual act to reward him for his legal work. During the ensuing criminal investigation of that conduct, he falsely denied that it had occurred, and then when confronted with evidence that he was lying, he placed all the blame for his misconduct on his victim. His continued refusal to acknowledge the seriousness and wrongfulness of his conduct with J.G. not only undermines public confidence in the legal profession but is evidence that he poses a real and continuing threat to his clients—the vast majority of whom are indigent criminal defendants—and the public at large. For these reasons, we overrule Carter's third objection and find that his misconduct warrants a sanction greater than the six-month actual suspension from the practice of law recommended by the board. We conclude that a two-year suspension, with one year conditionally stayed—which is comparable to the sanction we imposed in *Russ*—combined with the CLE requirements recommended by the board, is the appropriate sanction for Carter's misconduct.

### III. CONCLUSION

{¶ 42} Accordingly, Gregory Erwin Carter is suspended from the practice of law in Ohio for two years with one year stayed on the condition that he commit no further misconduct. If Carter fails to comply with the condition of the stay, the stay will be lifted and he will serve the entire two-year suspension. In addition to the requirements for reinstatement set forth in Gov.Bar R. V(24), Carter shall provide proof that he has completed a minimum of six hours of CLE focused on professionalism and appropriate client relationships, at least three hours of which

shall include sexual-harassment training, in addition to the requirements of Gov.Bar R. X.  Costs are taxed to Carter.

Judgment accordingly.

KENNEDY, C.J., and DEWINE, DONNELLY, STEWART, and BRUNNER, JJ., concur.

DETERS, J., concurs in part and dissents in part, with an opinion joined by FISCHER, J.

_____

**DETERS, J., concurring in part and dissenting in part.**

{¶ 43} Gregory Erwin Carter took advantage of a vulnerable person and forced her to engage in sexual relations with him.  For this—and two other violations of the Rules of Professional Conduct, which Carter does not dispute— the majority imposes a two-year suspension, with one year conditionally stayed.  Because I believe the majority's sanction does not go far enough "to protect the public against [a member of the bar who is] unworthy of the trust and confidence essential to the attorney-client relationship," majority opinion, ¶ 31, I dissent with respect to the sanction imposed by the majority.  I would impose at least a two-year suspension with no stay.

{¶ 44} The starting point for the sanction imposed for Carter's misconduct is the presumption that he will serve an actual suspension due to his violation of Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).  This much the majority gets right.  It correctly overrules Carter's assertion that his sanction for violating Prof.Cond.R. 1.15(a) and 8.4(c) should be fully stayed.

{¶ 45} Having determined that Carter should serve an actual suspension, the issue turns to the length of the suspension.  This case lays bare the limits of looking to past decisions to determine the appropriate length of a suspension.  The Board of Professional Conduct cited three cases to support its recommendation that Carter

be suspended for six months. But in none of those cases did the attorney force another person to perform a sex act, which the board found was clearly and convincingly shown here. Two of the cases—*Disciplinary Counsel v. Leon*, 155 Ohio St.3d 582, 2018-Ohio-5090, 122 N.E.3d 1242, and *Disciplinary Counsel v. Owen*, 142 Ohio St.3d 323, 2014-Ohio-4597, 30 N.E.3d 910—involved consensual sexual relationships. And while the third case, *Disciplinary Counsel v. Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775, involved sexual harassment, the harassment was limited to verbal harassment.

{¶ 46} The additional case discussed by the majority resulted in a sanction more severe than those imposed in the other cases. In *Disciplinary Counsel v. Russ*, __ Ohio St.3d __, 2023-Ohio-1337, __ N.E.3d __, the attorney received the same sanction imposed here—a two-year suspension with one year conditionally stayed. But as the majority acknowledges, unlike this case, no physical sexual contact occurred in *Russ*. And as the majority notes, the attorney in *Russ* "was found to be genuinely remorseful for his misconduct," majority opinion at ¶ 40, in contrast to Carter, who, the majority notes, "exhibits a disturbing refusal to acknowledge the seriousness and wrongfulness of his misconduct with J.G. and a complete lack of remorse for his actions," *id.* at ¶ 36.

{¶ 47} Perhaps the comparison cases could be considered analogous to this case if Carter's version of the incident—that the sex act was consensual—had been true. But the board found that the evidence clearly and convincingly showed that Carter had "deceived J.G. into meeting with him, alone, and sought sex as a 'reward' for his legal work." And the majority overruled his objections to those findings.

{¶ 48} Let's be clear about what Carter did here. His actions went well beyond *seeking* sex as a reward for his work. He summoned J.G., the mother of his client's child, to a meeting at his office after first identifying himself as the client's lawyer. Contrary to his claims, this contact did not involve two adults with an

ongoing flirtation. It was a ploy to get J.G. to his office. Carter was aware of J.G.'s vulnerability: J.G. had told Carter that she needed the client, Eric McClain, home for the benefit of her children. In fact, when Carter summoned J.G. to his office, J.G.'s children were in her car, waiting for J.G. while she went in to meet Carter. After reading the motion he planned to file in the case to her, Carter asked for his reward—a kiss. Then, he forced her to perform oral sex on him.

{¶ 49} " 'In [a] disciplinary matter, the primary purpose is not to punish an offender; it is to protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client; it is to ascertain whether the conduct of the attorney involved has demonstrated his unfitness to practice law, and if so to deprive him of his previously acquired privilege to serve as an officer of the court.' " *Ohio State Bar Assn. v. Weaver*, 41 Ohio St.2d 97,100, 322 N.E.2d 665 (1975), quoting *In re Pennica*, 36 N.J. 401, 418-419, 177 A.2d 721 (1962). Vulnerable members of the public, like J.G., who turn to attorneys for help, are precisely the people we seek to protect.

{¶ 50} Moreover, Carter has shown himself to be a person unworthy of trust and confidence. He remains remorseless for his predatory behavior. Instead, he argues that he and J.G. were both unmarried, that J.G. was not a client, and that J.G. had not hired him to represent McClain. His claims—even if technically true—are irrelevant when compared with the board's findings regarding the nature of the encounter, J.G.'s relationship to McClain, and her obvious vulnerability.

{¶ 51} I recognize that Carter was not criminally charged in this matter. That was law enforcement's decision to make, and other factors may have played into that decision. But a two-year suspension, with one year conditionally stayed, does not adequately satisfy this court's responsibility to protect vulnerable members of the public from a predatory attorney, particularly one who refuses to recognize the wrongfulness of his conduct. For a member of the bar to engage in what could easily be interpreted as a felony sexual offense is reprehensible on many

levels. His inability as an attorney to recognize the import of his behavior to the profession at large is the least of my concerns. As in other cases involving sexual offenses, the harm he caused J.G. is likely irreparable.

{¶ 52} I would impose an actual suspension of two years, at a minimum. Because the majority does otherwise, I respectfully dissent regarding its choice of sanction.

FISCHER, J., concurs in the foregoing opinion.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Martha S. Asseff and Kelli C. Schmidt, Assistant Disciplinary Counsel, for relator.

Dennis W. McNamara, for respondent.

_____